The State, ex rel. Wise, Appellee, *v.* Chand, Appellant.

(No. 69-175—Decided February 25, 1970.)

*Mr. Monte E. Mack,* for appellee.

*Messrs. Buckingham, Doolittle & Burroughs* and *Mr. Charles F. Scanlon,* for appellant.

CORRIGAN, J.  As part of her case, complainant called defendant as if under cross-examination.  Defendant being an adverse party, complainant's calling of defendant was proper if the proceeding was a civil action.  Section 2317.07, Revised Code.  (This section, a portion of the Code of Civil Procedure, provides that "at the instance of the adverse party, a party may be examined as if under cross-examination * * *.")

In our unanimous decision in *Taylor* v. *Scott,* 168 Ohio St. 391,, the question whether the Code of Civil Procedure is applicable to bastardy proceedings was settled.  Paragraph one of the syllabus in that case reads:

"Prosecutions of complaints under Sections 3111.01 to 3111.24, inclusive, Revised Code, relating to bastardy, are, unless specified otherwise therein, governed by the procedure provided for the trial of civil cases * * *."

No contention is made that anything in the Revised Code sections relating to bastardy specifies that the procedure provided for the trial of civil cases by Section 2317.07, Revised Code, should not apply in prosecutions of complaints relating to bastardy.

Hence, we conclude that the complainant in a bastardy action may, pursuant to the provisions of Section 2317.07, Revised Code, call the defendant as if under cross-examination.

Defendant's Proposition of Law No. 2 is presented as follows:

It is an abuse of the trial judge's discretion to cross-examine an expert witness called by the accused in a bas-

tardy proceeding where the effect, tone, and scope of such examination indicate to the jury the trial judge's opinion as to the weight that should be given the expert's testimony.

In his brief, defendant states that this witness, an expert in genetics, was offered for the purpose of showing "the probable coloring (skin and eyes)" that a child of complainant and defendant would have. The record discloses that the baby in the instant case had a sallow skin and blue eyes. As the interrogation indicates, the purpose of offering this witness was to provide evidence that a child of the defendant would probably not have blue eyes.

The witness was qualified as an expert in genetics, with a Ph.D. degree in that general field.

After some preliminary questions about genetics were asked on direct examination of this expert witness, he was asked and answered, without objection being taken, the following hypothetical question:

"Q. Now, Doctor, assume for example that you had a father who is of Indian descent, who both his mother and father were from India and his entire family tree is from the country of India. Assume further that the father is of dark skin, brown eyes and black or dark brown hair, and that his brothers are also dark brown skin, dark brown hair and dark brown eyes.

"Assume further that this alleged father has intercourse with a woman of white skin, black hair and hazel eyes, and assume further that her mother is white skin, dark hair, dark brown hair and hazel eyes, and that the father of this alleged mother or assumed mother has dark brown hair and hazel eyes, or nonblue eyes.

"Assume further, Doctor, that this alleged mother has one brother who has reddish-brown hair, nonblue eyes; could you as an expert in the field of genetics determine with any degree of probability the genetic mechanism as to the offspring of such sexual intercourse?

"A. I think in this instance you are talking about a person who is probably established as being reasonably pure with reference to genetic inheritance, that is, the fact

that a person has within his family, all immediate and known relatives, reasonably dark; you would assume this is reasonably pure sort of situation and accordingly, according to the principles of genetics, if a person such as that had a child by a person considerably lighter pigmentation, you would expect that the child would be something in between that of the father's and mother's in pigmentation as far as the skin is concerned.

"The hair is probably somewhat less definitive in this regard. As far as the eye pigmentation is concerned, if all of the known relatives of the father, that is, this hypothetical father, were brown eyed and he is of course also, we would anticipate that the children of such a mating would be brown eyed."

These questions and answers then followed on direct:

"Q. Would this also be true if the mother was non-brown eyed? Would there be a dominance of one color over the other?

"A. Yes, under ordinary circumstances one would expect this to be the case.

"Q. How is this? How is your answer derived? What are the natures of probability in the field of genetics?

"A. Well, it is a little difficult to answer the question without going into genetic theory and theory of probability perhaps, but if there is a pure, genetically pure brown eyed individual without any complicating factors involved, his children will be brown eyed.

"Q. Regardless of what—

"A. Regardless of what the other parent's eye color would be, yes."

At this point in the trial several questions were asked on cross-examination which did not tend in any manner to change the expert's opinion that "we would anticipate that the children of such a mating would be brown eyed." And this was regardless of what the other parent's eye color would be. Counsel for the complainant then stated that he had no further questions.

Whereupon the court took up the interrogation of the witness with these questions and answers:

"The Court: I have a question. Assuming the facts that have already been given to you, and observing the second man at the trial table and observing the woman seated across from him, would you be able to formulate an opinion based upon reasonable probabilities if you saw the child to which she gave birth on March 28, 1967, as to whether or not the defendant would be the father of that child?

"The Witness: Well, under those circumstances, your Honor, I would say the child should be some place in between the two individuals with reference to pigmentation.

"The Court: You have said that.

"The Witness: Yes, and I would say that the eye pigmentation, for example, would in high probability be brown in view of the fact that both [sic] of them are brown.

"The Court: My question was—

"The Witness: And then if there were other points that one wished to examine such as the shape of ear lobes, various things, one might further formulate a judgment on that basis, so that really perhaps I can say that one can never establish paternity or maternity for that matter on the basis of purely looking. One must admit that.

"The Court: Well then if I understand your answer, if this child were brought into this court room you could not form an opinion based upon seeing that child and examining that child and having seen both these people in the court room and the other facts that counsel asked you to assume; you could not say with reasonable probability that the individual was or was not the father of that child. Is that what you are saying?

"Mr. Glick: I object.

"The Court: Overruled.

"Mr. Glick: Sorry to the court. I think you are baiting [sic] the issue.

"The Court: I am not evading the issue. He has testified to certain opinions with reference to similarities. I am just asking him a specific. Does he have an opinion or could he give an opinion based upon reasonable probabili-

ties as to whether or not a given male was or was not the father of the child?

"The Witness: I think if you have a situation where you know a given female is the mother of the child—

"The Court: Assume this woman is the mother of the child.

"The Witness: Yes. I think there are certain judgments one could make to exclude certain children, yes.

"The Court: In other words, matter of exclusion only.

"The Witness: Yes, I think that would probably be a justified statement."

At this point, counsel for the defendant pursued some redirect examination of the expert witness, followed by one question on recross-examination, and then the court continued its inquiry of the witness in a series of a dozen more questions followed by these queries, with answers given by the witness:

"The Court: If this child were brought into this court room right now and you were asked to examined it [sic] and you examined this woman and this man, and assuming these other facts which counsel has given to you, do you have an opinion based upon reasonable probability—well, you could voice an opinion as to the fact that somebody was not the father of that child.

"The Witness: I think you could say with some degree of surety one could possibly eliminate certain possibilities, yes.

"The Court: Well, I am not sure I understand your answer.

"The Witness: I think one could say it is unlikely that a particular father of known genetic type is the type of another child.

"The Court: Well, to go back to the specifics, if a child were brought into this court room which was delivered of this woman and you examined her and you examined this man, the defendant here, and you examined this baby, by observation could you as a geneticist, if that is the correct name, give us an opinion based upon reasonable probabilities which would exclude this father?

"The Witness: It is possible, I think, yes.

"The Court: Possible?

"The Witness: Yes. Probable perhaps. I don't just know what the proper term should be.

"The Court: All right. Anything further?"

In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.

While a trial judge may interrogate a witness as long as the questions relate to relevant matters and do not show or even suggest to the jury that he favors one side or the other, a judge may not interrogate a witness in such a manner that the jury's conclusions as to the credibility of the witness may thereby be influenced.

In a jury trial, the credibility of the witness is a question solely within the province of the jury. 56 Ohio Jurisprudence 2d 843, Witnesses, Section 410. Therefore, a defendant in a jury trial has the right to have the jury, and the jury alone, make the determination on that issue. The trial judge must not encroach upon that right.

As stated in 98 Corpus Juris Secundum 60, Witnesses, Section 347:

"The trial judge must conduct his examination in an impartial manner, and he should not by his manner or the form of his questions show bias on his part or intimate his opinion on the merits or as to the credibility of a witness, except in a case tried without a jury."

The first objection to a question propounded by the judge is recorded to this query:

"The Court: Well then if I understand your answer, if this child were brought into this court room you could not form an opinion based upon seeing that child and examining that child and having seen both these people in the court room and the other facts that counsel asked you to assume; you could not say with reasonable probability that the individual was or was not the father of that child. Is that what you are saying?"

An examination of the phrasing of this question reveals that it goes beyond the mere elicitation of an opinion by the witness. The question itself was such as to imply to the jury that the expert witness could not give a satisfactory answer.

In our opinion, the form of the interrogation by the trial judge, of which the above is only one example, could only have indicated to the jury a feeling on the part of the judge that the witness could not provide a satisfactory answer and therefore that he doubted the credibility of the witness. In addition, the apparent intensity, tenor, range and persistence of the court's interrogation, as reflected by the sampling from the record (*supra*), compels the conclusion that the trial judge's opinion as to the weight which should be given the expert's testimony was implicit therein, and the jury was exposed to that opinion.

It is our conclusion that such participation by the trial judge in this case constituted error prejudicial to the substantial rights of the appellant, and for that reason the judgment of the Court of Appeals is reversed and the cause is remanded to the Juvenile Court for a new trial.

*Judgment reversed.*

HERBERT and DUNCAN, JJ., concur.

SCHNEIDER, J., concurs in paragraphs three and four of the syllabus and in the judgment.

TAFT, C. J., and O'NEILL, J., concur in paragraphs one and two of the syllabus but dissent from the judgment.

MATTHIAS, J., not participating.

TAFT, C. J., dissenting. The hypothetical question first asked of the expert witness and quoted in the majority opinion assumed several facts which are not supported by or are contrary to evidence in the record. Some of these facts are enumerated below, with statements in parenthesis as to their status relative to evidence in the record:

1. Alleged father of Indian descent (no evidence in record).

2. His mother and father from India (no evidence in record).

3. Alleged father's "entire family tree is from the country of India" (no evidence in record).

4. Brothers of alleged father of "dark brown skin, dark brown hair and dark brown eyes" (no evidence in the record).

5. Mother's father had "hazel * * * or nonblue eyes" ("They are hazel more—well, when he wears his blue shirt they look rather blue; when he wears a dark shirt, they look dark brown").

6. Mother has one brother who has nonblue eyes. (Only evidence was mother's mother's testimony: "My son has blue eyes and he has blue eyed grandfathers".)

In answering this hypothetical question, the expert witness further qualified his answer by adding to the hypothesis that the questioner was "talking about a person who is probably established as being reasonably pure with reference to genetic inheritance, that is, the fact that a person has within his family, all immediate and known relatives, reasonably dark." There is no evidence in the record to support this addition to the hypothesis.

In his answer, the witness stated that "as far as the eye pigmentation is concerned, if all of the known relatives of the father, that is, this hypothetical father, were brown eyed and he is of course also, we would anticipate that the children of such a mating would be brown-eyed." There is no evidence in the record as to the eye color of any relative of the defendant.

In the course of his direct evidence, as indicated in the majority opinion, this witness further testified that "if there is a pure, genetically pure brown eyed individual without any complicating factors involved, his children will be brown eyed." There is no evidence in the record as to whether the defendant was a "genetically pure brown eyed individual."

Actually, the direct testimony of this witness was essentially based upon an assumption as to the genetical purity of the defendant. Since there was no evidence in

the record as to any such genetical purity, this testimony had no evidential value.

The very brief cross-examination and recross-examination of this witness did nothing to raise any doubts as to the weight or relevance of his testimony.

For this reason, it is not surprising that the court asked whether the witness could, "assuming the facts * * * given to" him, and "observing" the defendant and the relator "be able to formulate an opinion based upon reasonable probabilities if * * * [the witness] saw the child * * * as to whether or not the defendant would be the father of that child."

The witness stated that such a "child should be someplace in between the two individuals with reference to pigmentation" of skin and that the eyes "would in high probability be brown in view of the fact that both * * * [parents' eyes] are brown." Then the witness volunteered the statement that "if there were other points that one wished to examine such as the shape of earlobes, various things, one might further formulate a judgment on that basis, so that really perhaps I can say that one can never establish paternity or maternity for that matter on the basis of purely looking. One must admit that."

Thereafter, the court asked the question quoted in the majority opinion that was the only question of the court which was objected to.

On subsequent redirect examination, the witness, when asked whether "the fact that the mother has brown eyes and father has brown eyes exclude a child that has blue eyes," answered that "it would exclude a father with brown eyes, assuming that this father is from a pure stock of brown eyed persons." There is no evidence in the record that the defendant was from such a pure stock.

Notwithstanding this lack of any such evidence, defendant's counsel then stated to the witness that, in his "hypothetical question" he had given "you the assumption that his stock was pure, of Indian, the country of India," and the witness answered "that is correct."

After the last questions quoted in the majority opinion,

the witness, on redirect examination, testified that if a dormant blue eye would appear in a child of the father he "would suspect it should be present in other members of" his "family" such as his brothers or sisters or his parents. There is no evidence in the record as to the color of the eyes of the defendant's parents or of any brother or sister of the defendant.

In his examination of this witness, the trial court was not only patient and fair in his questioning of the witness but was also courteous to and considerate of the witness; the court did not attempt to exhibit a severe attitude toward or to intimidate the witness; and the court did not interrupt either counsel in his examination of the witness.

As stated in the concurring opinion by Lamneck, J., in *State* v. *Lawrence* (1954), 162 Ohio St. 412, 417, 123 N. E. 2d 271:

"* * * A judge is to be commended for any determination displayed by him * * * to secure the truth."

Also, it is stated in the opinion by Marshall, C. J., in *C. A. King & Co.* v. *Horton* (1927), 116 Ohio St. 205, 211, 156 N. E. 124:

"* * * Counsel in this case, in urging that the court erred in propounding to witnesses questions which were designed to develop the true character of the transaction, and in charging the jury as to the law upon the facts thus developed, have a mistaken notion as to the true function to be discharged by the judge in presiding over a jury trial. The judge is not a mere sergeant at arms to preserve order in the courtroom. His chief function is to prevent injustice being done between the parties, and, as a corrollary thereto, to see that justice is actually administered. * * *"

Paragraph one of the syllabus of that case specifically recognizes that there may be a "duty of the presiding judge to further examine witnesses and develop the facts."

As indicated by what we have said in describing the opinion testimony of this witness, it should have been excluded if objected to, and should have been stricken if a motion had been made to strike it. If allowed to remain

in the record, the court on its own motion should have instructed the jury in the general charge to disregard such opinion evidence because based upon assumed facts as to which there was no evidence, instead of instructing the jury, as it did, that "if any assumed fact was not established by a preponderance of the evidence" the jury should "determine the effect of that failure upon the value of the opinion."

As stated by Zimmerman, J., in *State* v. *Holt* (1969), 17 Ohio St. 2d 81, 86, 246 N. E. 2d 365, with reference to the opinion of an expert witness which should have been excluded:

"Because of the witness's educational background and his apparent prestige, his testimony undoubtedly made an impression on the jury and was accorded greater weight than it was entitled to. * * *"

Since the opinion evidence of this witness should have been given no weight, we do not believe that there is any validity to defendant's complaint that the cross-examination of the witness by the court had the effect of creating a doubt in the minds of the jury as to whether the witness was expressing any opinion at all and whether his opinion testimony had any value.

Likewise, since defendant had offered testimony of an expert witness which should all have been excluded, we do not believe that there is any validity to defendant's complaint that the court's examination of the witness suggested to the jury that the accused should have asked this expert witness to examine the child and that defendant did not because the expert witness' opinion might have been unfavorable. Actually, this expert witness of the defendant volunteered a statement suggesting that an examination of the child might be helpful before the court's questioning, which led to the witness' testimony that such an examination might enable him to give an opinion excluding someone as the father.

O'NEILL, J., concurs in the foregoing dissenting opinion.