METAULLICS SYSTEMS COMPANY L.P., Appellant,

v.

MOLTEN METAL EQUIPMENT INNOVATIONS, INC. et al., Appellees.

[Cite as *Metaullics Sys. Co. L.P. v. Molten Metal Equip.
Innovations, Inc.* (1996), 110 Ohio App.3d 367.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 68598.

Decided May 20, 1996.

*Renner, Otto, Boisselle & Sklar, Gordon D. Kinder, Jay R. Campbell;* *Baker & Hostletler* and *Thomas H. Shunk,* for appellant.

*Ulmer & Berne, Ronald H. Isroff* and *James A. DeRoche,* for appellees.

---

TERRENCE O'DONNELL, Judge.

Metaullics Systems Company L.P. ("Metaullics") appeals a jury verdict in favor of Molten Metal Equipment Innovations, Inc. ("MMEI") and Paul Cooper, and denial by the trial court of injunctive relief and assignment of a patent.

Cooper worked for Metaullics until he left the company on June 1, 1990 and later formed MMEI.

Metaullics sued Cooper and MMEI, alleging Cooper had taken trade secrets concerning gas injection pumps used to mix and circulate molten metal and transfer pumps used to move metal, and also breached his employment contract with Metaullics.

In conformity with this position, Metaullics tried an equitable action to the court, seeking an injunction, simultaneously with a legal action tried to a jury, seeking monetary damages for Cooper's theft of trade secrets and breach of contract.

The evidence at trial revealed that Cooper had signed two employment agreements with Metaullics: one on November 23, 1982, as a part-time employee while still an engineering student, agreeing to disclose all ideas and inventions concerning Metaullics during his term of employment and the other, on January 23, 1984, when he became a full-time employee, agreeing not to take steps to set up a competing business prior to leaving Metaullics and agreeing not to take trade secrets if he should leave.

Cooper urged that when he left Metaullics the pump improvements were not developed to the point where they would constitute trade secrets and, three years later, he developed them and received a patent (U.S. Patent No. 5,203,681) on April 20, 1993, based upon his subsequent research and testing on these pumps.

At trial, the jury reached a verdict in favor of MMEI and Cooper, and the court denied the request for injunction and assignment of patent to Metaullics.

Metaullics now appeals and raises two assignments of error for our review.

## I

"The trial court erred in summarizing and commenting upon the testimony of plaintiff's witnesses and cross-examining plaintiff's witnesses in a manner which clearly conveyed to the jury the court's inaccurate and prejudiced view of that testimony, to plaintiff's detriment."

Appellant believes that the trial court erred in the manner in which it questioned its witnesses during trial thereby creating an impression which influenced the jury verdict.

Appellees contend that the court may, in its discretion, question witnesses to develop the truth, and believe that because appellant failed to properly preserve objection, any claimed error in this regard is waived.

We, then, are asked to consider whether the court's questioning of the witnesses in this trial is reversible error.

At the outset, we note that the trial judge posed questions to Cooper; Dr. Lewis Koppel, Metaullics' expert witness; Mr. Mordue, one of Metaullics' engineers; and Mr. Martin, Cooper's former supervisor at Metaullics. This procedure is authorized by Evid.R. 614(B), which provides:

"The court may interrogate witnesses, in an impartial manner, whether called by itself or a party."

However, the rule also states in subsection (C):

"Objection * * * to interrogation by [the court] may be made at the time *or at the next available opportunity when the jury is not present.*" (Emphasis added.)

The only preservation of objection to the court's actions of any type came at one jury recess when counsel for Metaullics objected to the factual characterizations of the court in questioning Dr. Koppel and moved for new trial and mistrial, which the court denied. The failure to object to the other witnesses constitutes a waiver of any claimed error as to them, but the timely objection as to Dr. Koppel properly preserved this issue for our review as to him. The record does not demonstrate that the court acted improperly in questioning this witness. The appropriate standard of review is whether the trial court abused its discretion in eliciting responses from the witness. An abuse of discretion involves an attitude on the part of the court which is unreasonable, arbitrary or unconscionable. See *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. Here, we must be cognizant that the issues presented for trial had been bifurcated and the court had every right to determine for itself and to confirm by witness testimony answers to its questions relating to the requested injunctive relief.

Further, the court included the following language in its charge to the jury.

"Also, do not be influenced by anything the Court may have said or done. Do not try to determine whether or not the Court has an opinion on the facts that you will have to decide. The Court has none. And you alone must decide the disputed facts in this case."

The law is that a jury is presumed to have followed instructions given to it by the trial judge. See *State v. Fox* (1938), 133 Ohio St. 154, 10 O.O. 218, 12 N.E.2d 413; *State v. Henderson* (1988), 39 Ohio St.3d 24, 528 N.E.2d 1237; *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, paragraph four of the syllabus; *Berlinger v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 830, 589 N.E.2d 1378.

Based upon the foregoing, we conclude that Metaullics preserved only the court's questioning of Dr. Koppel for our review. Upon examination of that colloquy, we do not find the trial court abused its discretion in questioning this witness, because the court's questioning was clearly relevant to the independent determinations which the court was called upon to make concerning the injunctive relief requested. Lastly, the court gave a proper curative instruction to clarify the jury's role as factfinder independent of court influence on the separate issue of monetary damages.

Accordingly, we find no merit to the first assignment of error.

## II

"The trial court erred in refusing to admit the expert opinion testimony of plaintiff's only scientific expert, Dr. Richard S. Henderson, on the ground that

Dr. Henderson had no personal knowledge of the facts to which he was going to testify. This ruling was in error because first, Dr. Henderson did have personal knowledge of the facts about which he was to testify and second, because personal knowledge is not a prerequisite to an expert's testimony."

Metaullics argues that the trial court erred by precluding its expert from offering testimony on trade secrets.

Appellees urge that the court ruled correctly because the witness admitted he was not involved in the design of molten metal pumps between 1988 and 1990 and, therefore, had no firsthand knowledge of that subject matter, and could not therefore testify as a fact witness on the extent of pump development or as to what had become a trade secret because he didn't know. Appellees also contend no factual basis exists upon which the witness could have formulated an opinion and, also argue because no proffer exists, the matter cannot be properly reviewed on appeal.

The issue for our consideration, then, is whether the trial court properly excluded testimony of Dr. Richard Henderson, the appellant's witness in this instance.

■ At the outset, we should note that Dr. Henderson, a part owner of Metaullics, began to testify when the defense counsel challenged whether an adequate foundation for his opinions had been presented and, in response, the trial court permitted defense counsel to conduct a voir dire on the issue out of the presence of the jury. Henderson admitted he was not an employee of Metaullics at the time Cooper worked there, that he never supervised Cooper in any way, and had no firsthand knowledge of what Cooper did on a day-to-day basis. Despite this lack of knowledge, Henderson intended to testify, ostensibly as an expert, about a statement of three trade secrets, that the company believed relevant to the case on trial, which admittedly Henderson and Metaullics developed at the request of trial counsel. The objection at trial to his testimony was, therefore, that Henderson could not testify to the existence of trade secrets if he didn't work for the company at the time they were developed. He simply didn't have any firsthand knowledge about the existence of these trade secrets at that time, and admitted that he never broke down Cooper's pump and thereby never actually saw these trade secrets. The trial judge accordingly ruled that he could not testify as to the trade secrets.

Two rules of evidence are instructive.

Evid.R. 602 states:

"A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. * * * This

rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses."

Evid.R. 703 states:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

■ Further, we are persuaded that a court has broad discretion in the admission of evidence, and the appropriate standard of review is whether the trial court has abused its discretion in its ruling. See *Berry v. Motorists Mut. Ins. Co.* (1983), 13 Ohio App.3d 228, 13 OBR 280, 468 N.E.2d 922.

Accordingly, we conclude that the court did not abuse its discretion in excluding this testimony based upon the witness's lack of perception and the status of the evidence at that point in the trial. This assignment of error is overruled.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

KARPINSKI, J., concurs separately.

PORTER, P.J., dissents.

KARPINSKI, Judge, concurring.

I concur in the principal opinion, but write separately to address matters raised by the dissenting opinion which are not supported by the law or facts in this case. The record shows that the parties received a fair trial and the jury verdict should not be disturbed.

I

Metaullics' arguments concerning judicial bias in the first assignment of error lack merit for both procedural and substantive reasons. See *State v. Davis* (1992), 79 Ohio App.3d 450, 607 N.E.2d 543; *Lorenc v. Sciborowski* (Mar. 16, 1995), Cuyahoga App. No. 66945, unreported, at 7–8, 1995 WL 116850 (Porter, J.). As in *Lorenc,* the record shows that the trial court actively presided over the lengthy, six-day trial and posed questions to almost every witness presented by either plaintiff or defendants. Evid.R. 611. Metaullics objected at trial to only one of the five incidents of "judicial bias" raised on appeal.

Although, as the dissent argues, it is not necessary for a party to object to every question posed by the trial judge, the appealing party should at a minimum have raised a timely objection concerning the questioning of each witness or

indicated on the record a continuing general objection. Failure to object either generally or specifically to the questioning of the four witnesses waives any claim of error concerning them. *State v. Davis*, 79 Ohio App.3d at 455, 607 N.E.2d at 546–547. If, as the dissent now contends, Metaullics did not want to "call attention to" the court's questioning in front of the jury, it should have objected outside the hearing of the jury as required by Evid.R. 614(C). *Id.*

The record shows that Metaullics objected during the six-day trial to the court's handling of one witness only, Dr. Koppel. Even if a party could subsequently resurrect waived objections concerning other witnesses by making a belated motion for mistrial as the dissent contends, Metaullics' motion for mistrial did not purport to do so because it expressly involved only Dr. Koppel. Metaullics' post-trial motion for new trial likewise concerned Koppel and for the first time mentioned two other witnesses who are not even discussed on appeal. It is not "hard to imagine" what more Metaullics could have done to preserve these belatedly raised claims.

The dissent relies on the "plain error" doctrine to overcome Metaullics' failure to preserve objections concerning four of the five named witnesses. Notice of plain error is extremely rare in civil cases and is invoked with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 209, 24 O.O.3d 316, 317, 436 N.E.2d 1001, 1003. The record does not satisfy this stringent standard in this case.

In fact, examination of the record reveals that all five claims of improper conduct are unfounded.[1] None of the cases cited by the dissent concerning the trial judge's limited authority to develop testimony involves simultaneous trials to both the court and a jury as in this case. Trial judges have an obligation to understand the equitable issues tried to the court and may, if necessary, conduct more extensive questioning concerning these issues than is permitted in cases tried solely to a jury. Metaullics never requested that the trial judge conduct his questioning outside the presence of the jury and instead now asks this court to assume, without any showing, that the judge adversely influenced the jury's findings. Under the circumstances, Metaullics' failure to object before trial to consolidating the preliminary injunction (tried to the court) with the merits (tried to the jury) or to take appropriate action at the consolidated trial when any error could have been corrected precludes it from belatedly raising claims concerning the effect of the judge's conduct on the jury after an adverse decision.

---

1. The dissent does not assert any error concerning the trial court's questioning of David Masarin, and I agree.

The record does not show that the trial court abused its discretion or that its questioning influenced the jury verdict in any way. As noted above, the trial court questioned almost every witness presented by either side. It is not surprising that the trial court asked more questions during Metaullics' case, because Metaullics presented nine witnesses and approximately six hundred twenty pages of testimony compared to three witnesses and one hundred three pages of testimony presented by defendants. To put this issue in perspective, Metaullics' claim of abuse of discretion involves fewer than ten pages out of the entire nine-hundred-thirteen-page trial transcript or approximately one percent of the six-day proceedings. During those six days Metaullics did not raise any argument concerning the four witnesses other than Koppel. Such a continuing failure to object indicates that none of the participants discerned any impropriety concerning them at trial.

The central issue concerns the trial court's questioning of Koppel. Because Metaullics' brief on appeal quotes excerpts from the same sections of Koppel's testimony four times, the significance of the statements is unduly magnified. The claims boil down to the three statements emphasized by the dissent. Koppel, who had previously been employed full-time by affiliates of Metaullics for approximately eleven years, admits that he was retained by Metaullics as an expert witness concerning damages.

Koppel was produced to testify concerning only damages and not Metaullics' substantive trade secrets or breach of contract claims. He began testifying in part based on a supplemental expert report which had not been provided to the defense prior to trial. His initial answers to the court's questions were evasive. The dissent notably omits his answers, which bolster Metaullics' theory of the case on the substantive trade secret and breach of contract issues.

The trial court's questioning, after the parties concluded, concerned whether Koppel's adjusted profit calculations took into account all development costs of the pump. The parties had presented different theories during trial concerning development of the pump: Metaullics admitted that by the time Cooper left its employment in June 1990 it had not fully developed plans for the pump that defendants ultimately manufactured, whereas Cooper claimed that he independently developed the pump after he left. The trial court's questions concern development costs after June 1990 and were based on the same terminology used by the parties during trial.

Metaullics complains that the trial court used suggestive variations of the terms "Cooper pump" and "develop" during its questioning of Koppel. However, as noted in the dissent, even Metaullics expressly used the term "Cooper pump."

During the course of trial, counsel for Metaullics,[2] Henderson[3] and Koppel[4] repeatedly used similar references to the pump in open court before the jury. The parties referred to numerous pumps during trial, and the term "Cooper pump" was merely a convenient shorthand reference to the particular pump Cooper indisputably physically produced. When viewed in the context of the case and the usage by the parties, the term does not improperly express or imply an improper opinion concerning who in fact created or owned the underlying concepts. Simply stated, the trial court did not commit reversible error by using the same terms Metaullics used to refer to the pump.

The precise meaning of the word "develop" in the trial court's questioning is ambiguous. Metaullics' theory was that it developed the pump in the sense of creating the generic design of the pump without complete details. Defendants' theory used the same term more broadly to include creating the generic design as well as subsequent modifications, in addition to manufacturing the pump. The term "develop" properly includes all these variations in meaning. The dissent's suggestion that the trial court's questions "clearly indicated," "implied," and stated in "no uncertain terms" the court's opinions to the jury concerning creation or ownership of the pump unjustifiably assumes only Metaullics' meaning of the word. The dissent also ignores that the purpose of Koppel's testimony during these isolated comments was to prove damages attributable to pump sales rather than ownership of the technology.

Moreover, to conclude that the trial court improperly invaded the province of the jury is to ignore these nuances in the meaning of the term "develop" and also to ignore the context of the entire trial. The record negates such a conclusion: the trial court submitted the issues to the jury, specifically accepted the jury's finding of the facts, and thereafter decided the equitable issues based on the jury's findings. To find prejudice, furthermore, from the trial court's use of terms repeatedly used by the various parties throughout the trial is unwarranted. Although the trial court, viewed in hindsight with night-vision goggles, could have chosen other words when questioning Metaullics' witnesses, its failure to do so does not constitute reversible error.

---

**2.** References by Metaullics' counsel include "Cooper Pump"; "Has Metaullics suffered lost profits from the sale by Mr. Cooper of his pump?"; "Did you [Cooper] apply for a patent based on novel aspects of this new pump that you designed at Molten Metal Equipment Innovations?"; and "This is the stuff that Mr. Cooper put on his advertisement to sell his pumps."

**3.** "I had already seen Mr. Cooper's pumps in the fields."

**4.** Koppel calculated damages "using the sales invoices that MMEI had provided us for their molten metal pumps and equipment * * *."

## II

Metaullics' remaining arguments concerning the exclusion of testimony in the second assignment of error are likewise unpersuasive. The record shows that Metaullics did not lay an adequate foundation for Henderson's opinion testimony before offering the testimony as required by the Ohio Evidence Rules. Evid.R. 705 specifically requires disclosure of the supporting facts or data *before* the expert provides any opinion testimony. Evid.R. 703 further requires that expert opinions be based on facts or data (1) perceived by the witness or (2) admitted into evidence at the hearing. *Wells v. Miami Valley Hosp.* (1993), 90 Ohio App.3d 840, 855–865, 631 N.E.2d 642, 651–658; *State v. Whitt* (1991), 68 Ohio App.3d 752, 757, 589 N.E.2d 492, 495; *State v. Robles* (1989), 65 Ohio App.3d 104, 107–111, 583 N.E.2d 318, 319–322. Metaullics failed to satisfy the requirements of either of these rules.

The voir dire of Henderson, an off-site research supervisor for Metaullics' parent corporation, revealed that Henderson had no direct involvement in the research or design of the pumps. He was not a member of the pump redesign team, did not oversee Cooper, and derived most of his knowledge concerning the pumps from other unspecified people on the pump team. The record shows, moreover, that Henderson was vague in his voir dire about the bases and sources of his opinions and did not adequately disclose them before his opinion testimony was offered.[5]

Metaullics' brief on appeal, on the other hand, is remarkably clear in specifying that Henderson obtained knowledge from at least three engineers directly involved on the pump design team, *viz.*, Gilbert, Mordue and Masarin. However, the trial transcript unambiguously shows that only one of these three engineers, Gilbert, testified prior to Henderson. Since Metaullics did not claim that Henderson's opinions could be supported only by facts perceived by him or admitted into evidence through Gilbert, and in fact argued a different basis at trial, this court must conclude that not all the facts supporting Henderson's opinion were admitted into evidence at trial before his opinion testimony was offered.

The dissent's contention that Gilbert's testimony provided a sufficient foundation is unpersuasive for two reasons. First, Metaullics never made this argument and continues to propose different foundations for the testimony. As noted above, Metaullics' brief on appeal specifically identifies three engineers, Gilbert, Mordue and Masarin. During closing argument to the jury, Metaullics claimed

---

5. The objection to this testimony was lack of foundation and not simply that Henderson lacked personal knowledge. Metaullics knew these requirements and was able to lay an adequate foundation for opinion testimony of Koppel regarding damages.

that Mordue, Gilbert and Martin rather than Masarin were the sources of the trade secrets. Finally, Metaullics' motion for new trial expressly stated that *two* engineers provided the foundation, *viz.*, Gilbert and Mordue.[6]

Metaullics' own proffer, cited by the dissent, belies the claim that the foundation for Henderson's opinion testimony was provided by Gilbert:

"We believe that he would testify that he examined the Cooper pump, that he had discussions *with persons like Mr. Gilbert* and learned information *similar to that [sic] that Mr. Gilbert's testified* earlier today * * *." (Emphasis added.)

The literal terms of this proffer state that Henderson's opinion was *not* based on Gilbert, but was based on other unidentified persons "like Mr. Gilbert" who had not yet testified from whom he had learned "similar" information. Finally, Henderson's own testimony during voir dire failed to disclose the specific bases.

Metaullics' citation to case law involving the Federal Evidence Rules to overcome the defects in this foundation is misplaced because the Federal Rules have fewer foundational requirements than the Ohio Evidence Rules. *Sowers v. Middletown Hosp.* (1993), 89 Ohio App.3d 572, 585–587, 626 N.E.2d 968, 977–979. Specifically, Fed.R.Evid. 705 permits giving opinion testimony before disclosing the supporting facts, whereas Ohio Evid.R. 705 conversely requires disclosure of the facts before offering the opinion. Moreover, Fed.R.Evid. 703 permits an expert's opinion to be based on a third category of information not permitted by Ohio Evid.R. 703, *viz.*, facts which were not perceived by the expert or introduced into evidence if they were made known to the expert prior to the hearing. By rejecting the Federal model when it promulgated these Ohio Evidence Rules, the Ohio Supreme Court deliberately adopted these differences. We must, therefore, adhere to the specific Ohio requirements in this case.

The purpose of these rules is to ensure that neither reviewing courts nor trial courts are required to engage in the sort of speculation engaged in by the dissent concerning the basis for the opinion testimony. Contrary to the dissent's argument, neither Henderson's voir dire nor even his report, proffer, or subsequent factual testimony at trial sufficiently demonstrated that his opinions were based on facts perceived by him or admitted into evidence at trial before Metaullics offered his opinion testimony.

---

**6.** Metaullics' motion for new trial states as follows:

"Witnesses Gilbert and Mordue had already testified as to the actual engineering work they had done, and they identified various documents upon which Dr. Henderson would have relied."

This statement in the motion is obviously inaccurate. The record shows Mordue had not "already testified" when the defense called Henderson.

Lacking a consistent theory, the purported basis for Henderson's testimony continues to shift like grains of sand. Metaullics made these conflicting arguments orally at trial and, upon reflection, in writing after trial. Even under a scrupulous review, the foundation for Henderson's testimony is obscure and one cannot reliably discern the basis for all or any of his opinions. Courts should not be required to guess, or as in this case second-guess, whether proposed expert opinions are based wholly or even in major part on information recognized by Evid.R. 703.

Because Metaullics did not sufficiently disclose all necessary supporting facts as required by the Ohio Evidence Rules, and Henderson's proposed opinion testimony was admittedly not limited to his personal knowledge, the trial court's ruling excluding his opinion testimony for lack of an adequate foundation was correct. The fact that other judges might not apply these foundational requirements as meticulously or might reach a different conclusion concerning the admissibility of this testimony does not establish that the trial court abused its discretion. *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603. Furthermore, the record shows that trial court made a similarly strict evidentiary ruling against defendants and excluded opinion testimony from their trade secret expert Stephen Hill.

An alternative way to introduce Henderson's opinion testimony would have required using hypothetical questions to elicit opinions based on assumed facts which could have been proved by the testimony of other witnesses later in the trial. The record shows, however, that Metaullics did not pose any hypothetical questions to Henderson or seek to recall Henderson after the other engineers had testified. Because Metaullics failed to present the proposed opinion testimony properly, and the trial court had a legal basis for excluding the evidence, Metaullics has failed to show that the trial court erred or abused its discretion by acting unreasonably, arbitrarily or unconscionably.

I concur in the principal opinion affirming the trial court's judgment on the jury verdict.

JAMES M. PORTER, Presiding Judge, dissenting.

I must respectfully dissent from the majority opinion herein.

I find that the plaintiff-appellant Metaullics is entitled to a new trial because the trial court improperly interjected questions and statements in its examination of plaintiff's witnesses which disparaged their testimony before the jury and indicated in unmistakable terms its opinion in favor of defendants on the most critical issue in the case: whether plaintiff or defendants developed the trade secrets at issue. I also find that the court committed reversible error in excluding plaintiff's expert testimony on the same issue. Contrary to the

majority's conclusion, the plaintiff preserved these errors on appeal by timely objections and motions for mistrial at the end of plaintiff's case and at the end of all the evidence. It is hard to imagine what more the plaintiff could have done to preserve the judicial errors manifest upon this record.

This appeal turns on the very delicate situation where a trial court interjects itself in the examination of witnesses. While a trial court is permitted to examine witnesses, there are strict limits placed on judicial questioning of witnesses, lest the court by its inquiries give the appearance of favoring one side or the other. The majority correctly observes that the court has discretion pursuant to Evid.R. 614(B) to "interrogate witnesses, in an impartial manner, whether called by itself or by a party." A reviewing court must determine whether the trial court abused that discretion, *i.e.*, to interrogate in "an impartial manner." *State v. Prokos* (1993), 91 Ohio App.3d 39, 44, 631 N.E.2d 684, 687.

However, the court's discretion is severely limited to ensure that the right to trial by jury is preserved. The court's discretion is not a license to disparage witnesses or prejudice a party's case, as was done in the trial below. That discretion is circumscribed by the Supreme Court's admonitions in *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613, paragraphs three and four of the syllabus:

"In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion of the evidence or on the credibility of a witness.

"In a jury trial, where the intensity, tenor, range and persistence of the court's interrogation of a witness can reasonably indicate to the jury the court's opinion as to the credibility of the witness or the weight to be given his testimony, the interrogation is prejudicially erroneous." See, also, *State v. Prokos, supra; Sweet v. Clare–Mar Camp, Inc.* (1987), 38 Ohio App.3d 6, 8, 526 N.E.2d 74, 77; *Jenkins v. Clark* (1982), 7 Ohio App.3d 93, 98, 7 OBR 124, 129–130, 454 N.E.2d 541, 548; *State v. Bridgeman* (1977), 51 Ohio App.2d 105, 117, 5 O.O.3d 275, 281, 366 N.E.2d 1378, 1387 ("[A]ny expression by the trial court, and particularly any positive statement to the jury which indicates or even intimates to the jury the court's opinion on the facts in evidence is error.").

I agree with Metaullics' contentions that the trial court repeatedly overstepped the *Chand* boundaries by clearly expressing its opinion on hotly contested issues which were critical to the outcome of the case. Specifically, plaintiff argues in its brief:

"The court grilled plaintiff's witnesses making it clear to the jury that the court doubted their credibility; and the court answered questions posed by plaintiff to defendants' witnesses, indicating that the court favored defendants; and the

court went beyond intimating its views on the case and in fact told the jury through statements interposed between its own questions to plaintiff's witnesses that defendants had developed the pump at issue, thus stating its opinion that the defendant has not stolen the plaintiff's trade secrets or breached any employment agreement with Metaullics."

Unfortunately, these contentions are fully supported by the record.

Examples of the court's intervention include the court's examination of plaintiff's damage expert, Dr. Lewis Koppel:

"The Court:  It certainly, *if Metaullics built that same pump,* it would have cost them some money, wouldn't it?

"Dr. Koppel:  Built in terms of built and sold the pumps, your Honor?

"The Court:  Built and sold the pump, but it would cost them something to develop it.  *They didn't develop it, Mr. Cooper developed it.*  It would have cost them some money to develop it, wouldn't it?  *They would have to pay their engineers and do all the tests that Mr. Cooper did and so forth.*  Wouldn't they be cost charged against profits on the pump?

" * * *

"Dr. Koppel:  Right.  And it's a trade secret case, so to the extent that there was additional work that had to be done, there would have been some additional expense, that's correct, but this is a calculation strictly of what MMEI earned.  It has nothing to do with what—

"The Court:  Forget MMEI.  It would have cost Metaullics money to develop this pump, *this pump had not been developed.  There had been nothing done on this pump that Mr. Cooper developed.*  It would have cost them money to do that, wouldn't it?

"Mr. Koppel:  It would have likely cost some additional funds.

"The Court:  What do you mean additional?  It would have cost them money to make the pump from the beginning to the end.

"Mr. Koppel:  To manufacture and sell these pumps, yes, they would have had manufacturing expenses.

"The Court:  How much would that have been?

"Mr. Koppel:  That would typically be measured by Metaullics' gross profit margins, for example, or an alternative measure would be MMEI's gross profit margins, in that they're similar kinds of operations.

"The Court:  But you don't know, is what you're telling me now?

"Mr. Koppel:  I'm sorry, your Honor—

"The Court: Well, it's got to cost them some money. *They just can't come, for instance, take Mr. Cooper's pump, and say, 'We're taking all your profits,' including his labor, his work and things, right?*

" * * *

"The Court: You didn't have '90 or '91 [financial statements], did you?

"Mr. Koppel: There is no element in the equalizations [*sic*, calculations] for profits in '90, '91.

"The Court: You didn't have '90, '91. Did you inquire where are they, of the lawyers? Did you ask where are '90 and '91?

"Mr. Koppel: At the beginning of my involvement in this case I asked for all of the financial statements that could be gotten.

"The Court: Didn't you say you wanted '90 and '91?

"Mr. Koppel: Yes.

"The Court: Where are they? When you didn't get them, did you ask the next question, 'Where are they?'

"Mr. Koppel: And I was told that they hadn't been produced.

"The Court: That's what you were told, right?

"Mr. Koppel: Yes.

"The Court: And you never went any further than that, and you come in here today, right, and as far as you knew there was nothing in '90 and '91, until they handed you the income tax returns?

"Mr. Koppel: There were—I believe I saw the '90 tax form. Tax form is not a financial statement." (Emphasis added.)

The emphasized statements in no uncertain terms informed the jury that the pump was Cooper's, that Metaullics had not developed it, that Cooper developed it, and that Metaullics was not entitled to take the fruits of Cooper's labor. The implications in these statements went to the heart of the case. They squarely violated the cardinal principle that "[a] trial judge must remain impartial at all times and avoid making comments that might influence the jury." *State v. Allen* (1995), 102 Ohio App.3d 696, 700, 657 N.E.2d 843, 845. At the same time, the court's examination tended to minimize plaintiff's injury by pointing out perceived omissions from plaintiff's damage case.

There were other episodes that bear recounting. In examining one of Metaullics' development engineers, Mr. Mordue, the court expressed its disbelief in Mordue's description of his participation in the development of the trade secrets by asking, "You had all that technology. Why didn't you just make a pump like

Cooper did?" This question implied to the jury that Cooper was the inventor of the pump, rather than Metaullics, *i.e.*, Metaullics had no trade secrets which Cooper stole. "While the court can ask neutrally phrased questions, its questions should not suggest disbelief in a witness's testimony." *State v. Prokos, supra,* 91 Ohio App.3d at 44, 631 N.E.2d at 687.

The court also interrupted plaintiff's cross-examination of Cooper, answering for Cooper and prompting him with leading questions in a manner that was prejudicial and improper. Plaintiff had endeavored to prove that Cooper had a plan to set up a competing business before he ever left Metaullics, contrary to his employment agreement covenants, and consulted an attorney regarding such a competing business. The court interrupted the cross-examination of Cooper on this point:

"Q. [By plaintiff's counsel, Mr. Shunk, to defendant Cooper:] And now can you tell the jury, sir, why you decided to ask Mr. Nikaido [the lawyer] what you could and couldn't do? What was your motivation in asking that if you had no intention at the time?

"The Court: Well, I believe he testified yesterday that he always thought of starting a new business, he always had that in his mind when he was in college.

"Mr. Cooper: Yes I did.

"The Court: That was the reason, sir; is that right?

"Mr. Cooper: I've always thought of starting a new business."

The court's adoption of Cooper's earlier testimony indicated to the jury that the court found Cooper to be credible and believed Cooper's claims that when he left Metaullics he had no plans to set up a competing business. This intervention went beyond "even intimat[ing]" its opinion; it went beyond "scrupulous limit[ation]" and clearly "indicate[d] to the jury the court's opinion on the facts in evidence." *Chand, supra,* 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613; *State v. Bridgeman, supra,* 51 Ohio App.2d at 117, 5 O.O.3d at 281–282, 366 N.E.2d at 1387. The court's interruption preempted a line of questioning which could have borne unfavorably on Cooper's motives in seeking legal advice to start a competing business while still employed by Metaullics. This kind of commentary was clearly improper and unwarranted.

The court also disparaged the testimony of Mr. Martin, Cooper's supervisor at Metaullics, who had a conversation with Cooper just before he left the company. In that conversation, Martin testified that Cooper told him that Cooper had ideas for a pump which he was not going to disclose to Metaullics in contravention of his employment covenants. At the conclusion of Martin's testimony, the following colloquy took place:

"The Court: All right. You [Mr. Martin] didn't tell anyone about this conversation that you had with Paul [Cooper] in 1990; is that correct?

"Mr. Martin: Until just now?

"The Court: Yes, just now.

"Mr. Martin: Well, my attorneys were aware of this conversation.

"The Court: Your attorneys. Are these your attorneys?

"Mr. Martin: These are the Metaullics' attorneys.

"The Court: This was in 1990, when did you tell them?

"Mr. Martin: Well, when this became an issue.

"The Court: When was that?

"Mr. Martin: I can't remember when that was. When I was deposed.

"The Court: It had to be 1993.

"Mr. Isroff: Your Honor, to refresh, his deposition was taken in December of 1993.

"The Court: '93, I see, yes. When did you next think of it, in 1990, the conversation was? When did you next think of it, or did you think about it everyday?

"Mr. Martin: No, I didn't think about it everyday.

"The Court: When did you next think of it?

"Mr. Martin: I next thought about it when I understood that Paul Cooper was into the pump business.

"The Court: That was a couple of years later?

"Mr. Martin: Yes.

"The Court: That's when this conversation come [sic] back to you very clearly at that time, right?

"Mr. Martin: That's when I thought about it.

"The Court: But you don't know where you had it, you don't know when you had it; is that right?

"Mr. Martin: I had it in the time frame in early—the six months—

"The Court: Sometime within six months you had it?

"Mr. Martin: Yes.

"The Court: Okay. All right. You may step down."

This examination clearly conveyed to the jury by its tenor, intensity, range and persistence the trial court's disbelief in Martin's testimony in violation of the rules set forth in *Chand.* It was prejudicial for the court to imply in the presence of the jury that Martin was fabricating this incriminating conversation with Cooper because he did not report it earlier. In effect, the court's questioning implied that the jury should not believe plaintiff's claims that Cooper had plans or ideas relating to pumps before he left Metaullics and that he improperly withheld them from Metaullics in order to start his own business later.

I find that the trial court's questions and comments in the presence of the jury crossed over the line of proper intervention to guarantee that the truth is presented. The defendants were represented by experienced and capable counsel. It was not necessary for the court to take an adversarial role in developing the evidence. To state that the pump was not developed by Metaullics but by Cooper after he left Metaullics' employ could not simply be cured by boilerplate instructions in the general charge to disregard the judge's earlier remarks. The fallacy of that conclusion is put to rest by the Supreme Court in *State v. Thomas* (1973), 36 Ohio St.2d 68, 72, 65 O.O.2d 216, 218, 303 N.E.2d 882, 884:

"It is well known, as a matter of judicial notice that juries are highly sensitive to every utterance by the trial judge, the trial arbiter, and that some comments may be so highly prejudicial that even a strong admonition by the judge to the jury, that they are not bound by the judge's views, will not cure the error."

When the judge is interposing frequently (as he was here), the failure to object each time is not a sufficient ground for arguing that counsel waived these errors. An opposing attorney only magnifies the prejudicial remarks by calling attention to them, especially when the examiner can overrule any objections to his own questions. The appellant correctly notes that "the trial judge's comments were so pervasive that the instruction given could not cure the error; in fact, no instruction could have cured the error." The court's conduct was beyond the pale, and plain error warrants reversal and a new trial. Evid.R. 103(D). *Reichert v. Ingersoll* (1985), 18 Ohio St.3d 220, 223, 18 OBR 281, 283–284, 480 N.E.2d 802, 805 ("The plain-error doctrine permits correction of judicial proceedings when error is clearly apparent on the face of the record and is prejudicial to the appellant.").

The majority also excuses the court's improprieties in a bifurcated trial by stating that *"the court had every right* to determine for itself and *to confirm by witness testimony answers to its questions relating to the requested injunctive relief."* (Emphasis added.) This conclusion reflects an elementary misconception of the court's role in a case where legal and equitable issues are tried together. To satisfy itself, the court does not have the right to influence the jury findings. Otherwise, trial by a fair and impartial jury is illusory and a sham. What the

majority overlooks is that Evid.R. 614(B) requires the court to "interrogate witnesses in an impartial manner," despite the fact that equitable issues are also at stake.

Like its federal counterpart, Ohio Civ.R. 65(B)(2) makes clear that where the trial court is hearing the equitable issues on the merits: "This Subdivision (B)(2) shall be so construed and applied as to save to the parties any rights they may have to trial by jury." "This [section] precludes a bench trial of facts that are common to legal and equitable claims. If they are tried together, they must be tried to the jury." 7 Moore's Federal Practice (2 Ed.1988) 65–122–23, Section 65.04[6]. "Indeed, in order to safeguard the parties' Seventh Amendment rights with respect to claims triable to the jury, the general rule is that the jury must be allowed to decide the legal claims prior to the court's determination of the equitable claims * * *." *LeBlanc–Sternberg v. Fletcher* (C.A.2, 1995), 67 F.3d 412, 432; *Bouchet v. Natl. Urban League, Inc.* (C.A.D.C. 1984), 730 F.2d 799, 803 ("As a general rule, when a case contains claims triable to a jury and claims triable to the court that involve common issues of fact, the jury's resolution of those issues governs the entire case."). The trial court had no right to impose its views of the evidence on the jury.

Based on the foregoing, I would sustain Assignment of Error I.

I would also sustain Assignment of Error II, which deals with the exclusion of the testimony of plaintiff's trade secret expert, Dr. Richard Henderson. Dr. Henderson was employed by Metaullics' corporate parent, BP America, and was a member of BP's corporate research staff assigned to Metaullics. Dr. Henderson's testimony as to the trade secrets was excluded altogether by the trial court after an extensive voir dire out of the presence of the jury. As the majority notes, the objection to his testimony was that "Henderson could not testify to the existence of trade secrets if he didn't work for the company at the time they were developed * * * [and] didn't have any firsthand knowledge * * *." Lack of personal knowledge was no reason to exclude Dr. Henderson's testimony.

Most experts are consultants or independent contractors retained *after* the events at issue occurred. Their testimony is frequently elicited by hypothetical questions. They do not have *personal* knowledge of the underlying facts upon which their opinions are based. If every expert had to work at the company where the events occurred, there would be very little expert testimony.

The trial court misunderstood the application of Evid.R. 703 in the circumstance of this case, and the majority compounds that error by approving of the trial court's action. Evid.R. 602, which requires personal knowledge for a witness to testify, expressly states that "[t]his rule is subject to the provisions of Rule

703, relating to opinion testimony by expert witnesses." The purpose of this exception is explained:

"The reference in Evid.R. 602 to Rule 703 is to avoid any question of conflict between the two rules, the latter of which permits an expert to express an opinion based on facts of which the expert does not have personal knowledge. Staff Note to Evid.R. 602. Evid.R. 703 states that '[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing.'" *Huebner v. Miles* (1993), 92 Ohio App.3d 493, 502, 636 N.E.2d 348, 354.

The voir dire examination, Henderson's expert report and plaintiff's proffer clearly laid the proper foundation for Dr. Henderson's testimony. Plaintiff's proffer stated:

"If Dr. Henderson were asked the appropriate questions, we believe he would testify to all of the matters that are set forth in his expert report * * *.

"We think he would explain the three trade secrets of Metaullics to be precisely those three trade secrets that were referred to in my opening statement.

"We believe that he would testify that he examined the Cooper pump, that he had discussions with persons like Mr. Gilbert and learned information similar to that that Mr. Gilbert's testified earlier today, that based upon reading that information and based upon his own expertise, gained from his training and his years of experience in the field and his position as Director of Engineering Research and Design at Metaullics, that he would reach the opinion that the three trade secrets he identified were, indeed, to be found in the Cooper pump.

"And he would give explicit testimony as to the way in which the company first learned that the trade secrets were embodied in the pump and the actions that were taken in order to determine that the trade secrets were located in the pump.

"He would also testify, we believe, as to the value of the trade secrets and would explain to the jury in precisely what way the trade secrets were not known to the public generally and gave Metaullics an advantage over competitors in the marketplace."

That Dr. Henderson may have gained data or information or insights at business meetings among the Metaullics' researchers was not a basis for excluding his testimony. Experts may glean information from numerous sources, including books, upon which to base their expertise. *Kane v. Ford Motor Co.* (1984), 17 Ohio App.3d 111, 112, 17 OBR 173, 174–175, 477 N.E.2d 662, 664–665; *Worthington City Schools v. ABCO Insulation* (1992), 84 Ohio App.3d 144, 152–153, 616 N.E.2d 550, 555–556. In any event, as the proffer makes clear, Henderson's expert testimony would have rested on the foundational testimony of

Mr. Gilbert as "perceived by him or admitted in evidence at the hearing." Evid.R. 703.

The court erred in excluding any and all opinions by Dr. Henderson on trade secret matters because they were not based on his personal knowledge of the facts of the case.

I would sustain Assignment of Error II.

I would reverse the judgment and remand the cause for a new trial before a different judge.