NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1556

THE STATE OF OHIO, APPELLEE, *v*. WEST, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. West*, Slip Opinion No. 2022-Ohio-1556.]

*Criminal law—Application of the plain-error standard of review when the accused failed to object at trial—Judgment affirmed.*

(No. 2020-0978—Submitted June 30, 2021—Decided May 11, 2022.)

APPEAL from the Court of Appeals for Franklin County,

No. 19AP-90, 2020-Ohio-3434.

_____

**KENNEDY, J., announcing the judgment of the court.**

{¶ 1} In this discretionary appeal from the Tenth District Court of Appeals, we consider whether a judge's comments and questions to witnesses during a criminal trial violated the accused's right to a fair trial before an impartial judge, causing structural error notwithstanding the accused's failure to object.

{¶ 2} A structural error is a violation of the basic constitutional guarantees that define the framework of a criminal trial; it is not susceptible to harmless-error

review but rather, when an objection has been raised in the trial court, is grounds for automatic reversal. *State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 2, 20  But when the accused fails to object to the error in the trial court, appellate courts apply the plain-error standard of review, shifting the burden to the accused to demonstrate that the error affected the trial's outcome. *Id.* at ¶ 17. We have "rejected the notion that there is any category of forfeited error that is not subject to the plain error rule's requirement of prejudicial effect on the outcome." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 24, citing *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 23.  We do not retreat from that position today.

{¶ 3} Appellant, James R. West Jr., the accused in this case, failed to object to the trial judge's questioning him during his cross-examination.  West therefore bears the burden to demonstrate plain error on the record—i.e., that there was a plain or obvious error that affected the outcome of the trial and resulted in a manifest miscarriage of justice, *id.* at ¶ 22.  Even assuming that the trial judge's questioning constitutes error, West's convictions are nonetheless supported by overwhelming evidence of his guilt, and he has not established that any error affected the outcome of his case.  He therefore has not shown the existence of plain error on the record.

{¶ 4} For these reasons, we affirm the judgment of the court of appeals.

**Facts and Procedural History**

{¶ 5} On October 2, 2017, Patrick Akers drove to the Beverage Warehouse in the South Linden neighborhood in Columbus to buy a bottle of liquor.  His friends Donovan Banks and "Reese" followed him to the store in a separate car, a Dodge Charger, and waited outside.  Inside the store, Akers saw Reese's girlfriend "Nay" and joined her in line.

{¶ 6} West was standing beside Nay at the cash register, and Akers asked if he was in line.  West suggested that Akers could go first if Akers "put[] $20 on his

bottle," i.e., paid for part of West's purchase, but Akers did not understand him. According to Akers, West became belligerent after Akers asked him what he meant, and West mentioned having ammunition in his car.

{¶ 7} West swatted Akers with an open hand, knocking Akers's hat to the side, and Nay and other customers tried to separate them and deescalate the situation. Akers left the store, and West pushed through Nay and other customers who were trying to keep him from following Akers outside.

{¶ 8} As Akers walked away from the store, he signaled Banks and Reese to come over and, according to Akers, warned them that there was "static." Two passengers in West's car, "D" and an unidentified man, got out of the car and approached Akers in the parking lot while Reese got out of the Charger and joined Akers.

{¶ 9} The unidentified man punched Akers, Reese punched West, and then D punched Reese. According to Akers, D had two handguns, both of which "fell from his waist and hit the ground" during the fight. D picked up both guns. Banks then got out of his Charger, and Akers and Reese moved behind him. West, D, and the unidentified man approached the Charger, and after D hit Banks, West's group backed away.

{¶ 10} Once the two groups were separated by at least a car length, West took a handgun from D and fired shots toward the Charger's front driver's side until he expended the clip. Akers took cover at the rear passenger's side of the Charger while Banks and Reese ran from the parking lot. As West finished shooting, D ran from the scene, turning to fire shots toward the passenger's side of the Charger where Akers was taking cover. Akers was shot twice in his right leg.

{¶ 11} West drove away moments before officers from a nearby police substation arrived on the scene and secured the area. In the hospital, Akers picked West and another person from a photo array. West agreed to be interviewed by detectives, and he gave a statement in which he admitted that he had had a

confrontation with Akers at the Beverage Warehouse and that someone had punched him in the parking lot. West told the detectives that he was by himself, and after he heard gunshots, he jumped in his car and drove away. West denied having a firearm and denied shooting at anyone.

{¶ 12} The grand jury returned a three-count indictment charging West with two counts of felonious assault, each with a firearm specification, and one count of having a weapon while under a disability. At trial, the state presented the testimony of Akers, the officers who had responded to the scene, and the detectives who had interviewed West. The state also presented evidence of West's prior convictions and security-camera footage from the Beverage Warehouse showing the altercation and shooting from multiple angles.

{¶ 13} Against the advice of defense counsel and over the admonishment of the judge, West testified on his own behalf. He explained that while he was in line to buy a bottle of liquor and speaking to Nay, Akers approached and asked why he was speaking to her. Akers then asked to pass him in the line, and West told him that he could, if Akers gave him $20. An argument ensued, and West antagonized Akers by calling him "broke" and saying, "Most broke people can't fight." He also showed Akers the cash that he had pulled from his pocket and said, "Look, you'll never get this much money."

{¶ 14} West testified that when he produced his cash, Akers said, "I'm going to take that shit from you." West then proceeded to narrate the security-camera footage of this encounter; he concluded his narrative in time with the footage of him pulling his money out in front of Akers and the comment Akers made in reply. The judge then asked West, "So you're claiming that he said he would rob you," and West responded, "Yeah. His actual words was, 'I'm gonna take that shit,' is what he said to me." West testified that "[Akers] said he was going to his car after he said he was going to rob me," and the judge asked, "He didn't say he was going to rob you. You thought that's what he was implying by

4

saying * * * 'I'm going to take your money'?" West responded, "He said, 'I'm gonna take that shit.' "

{¶ 15} West testified that when Akers left the store, Akers signaled to his friends and yelled to them, "I got something for us," not "[w]e got static." As West narrated the security-camera footage of the action in the parking lot with a laser pointer, defense counsel asked West where he was, and West replied, "I'm right here. I'm being struck." The judge then inquired, "Is that you?" West confirmed, "Yeah, that's me getting struck, and that's Akers right there trying to strike me, too." West narrated additional security-camera footage of the scene from a different angle, after which the judge asked him, "Is that you with the gun, shooting?" West admitted, "That is me with the gun, shooting."

{¶ 16} West testified that he acted in self-defense, asserting that when Reese punched D, both men dropped a firearm. He also claimed that when the driver of the Charger—Banks—got out of his car, he had a firearm. West explained that he retreated when he saw Banks with a gun and that he then took a handgun from D and began shooting, stating "I was in fear for my life at that point." West also testified that he did not intend to kill anyone: "I was aiming at the ground for real. I wanted everybody to get out of the vicinity. I didn't want to get shot with all the guns falling out. I was shooting at the ground, trying to get away."

{¶ 17} During cross-examination, West admitted that getting punched made him mad and that he then pursued Akers's group to fight. When the prosecutor stated that he was wrapping up, the judge asked the prosecutor, "Did he make a statement to a police officer?" The prosecutor, who had not covered this topic during cross-examination, responded, "He did," and then began questioning West about the statement he had made to police:

Q. All this happened. It's all on video. We clearly see you shooting. You made a statement to the cops, didn't you?

A. Yes, sir.

Q. And, of course, you told them you had a gun and were shooting because these guys brought a gun into the situation?

THE COURT: You lied to the police, didn't you?

THE DEFENDANT: Because I wanted to give myself a fighting chance at court.

\* \* \*

Q. Okay. You said, "There was some shooting, but it wasn't me," right?

A. I just told you what I said. I didn't have a lawyer present, so why would I plead to anything?

THE COURT: It wasn't a question of pleading. You waived your right, and you made a statement to the police. You didn't tell them it was self-defense at that time. It's just that simple, right?

THE DEFENDANT: Yes, sir.

West did not object to any of the court's questioning.

{¶ 18} After the close of evidence, the judge gave the following instruction to the jury:

The next part is important. Sometimes I ask questions. However, any question that I ask or any tone in my voice, because I can get aggravated, don't take that as any indication of how I think the case should come out.

How I think a case should come out has no bearing on anything. Don't place any emphasis on any questions I asked, and don't put any emphasis on why I asked a question. It doesn't matter. What matters is your evaluation. If I did anything, disregard it.

6

{¶ 19} The jury found West guilty of both counts of felonious assault and the associated firearm specifications, and the trial court found him guilty of having a weapon while under a disability, a count that had been tried to the bench. At sentencing, the judge noted his belief that West had lied on the witness stand and that he was on drugs on the night of the incident, but he imposed the same aggregate amount of prison time that was offered to West at plea-bargaining even though the state had recommended a longer sentence after the trial. The judge sentenced West to four years in prison for the felonious assault of Akers, two years for the felonious assault of Banks, and three years each for the firearm specifications, all to be served consecutively. The judge also sentenced West to three years in prison for having a weapon while under a disability, to be served concurrently with the other terms of incarceration, for an aggregate 12-year prison sentence.

{¶ 20} The Tenth District Court of Appeals affirmed. The court rejected the argument that the trial court exhibited bias in questioning West at trial and therefore committed structural error. Instead, the court of appeals applied the plain-error standard of review to determine whether West had been prejudiced by the judge's questioning. The appellate court concluded that West had not demonstrated plain error, because "when viewed in the context of the record as [a] whole, the trial court's questions were limited, and came only after the trial court gave specific warnings to West regarding testifying against his attorney's advice and the effect that would have on his case. * * * And finally, any arguable problem was cured by the trial court's curative instruction." 2020-Ohio-3434, ¶ 17.

{¶ 21} We accepted West's appeal to review a single proposition of law: "A criminal defendant's Due Process right to a fair trial under the United States and Ohio Constitutions is violated when the trial court engages in questioning that shows bias against the defendant. Such error is subject to a structural error analysis and is grounds for automatic reversal." 160 Ohio St.3d 1451, 2020-Ohio-5166, 157

N.E.3d 771.

## Law and Analysis

### *Plain, Harmless, and Structural Error*

{¶ 22} " 'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.' " *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), quoting *Yakus v. United States,* 321 U.S. 414, 444, 64 S.Ct. 660, 88 L.Ed. 834 (1944). When the defendant forfeits the right to assert an error on appeal, an appellate court applies plain-error review. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21-22. Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore "is not required to correct it." *Rogers* at ¶ 23.

{¶ 23} In contrast, when a defendant objects to an error at trial, an appellate court applies harmless-error review. *Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 15. Under that standard, the state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *Id*. As with plain error, "[w]hether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial," *Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, at ¶ 18. But "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). An appellate court is required to reverse the conviction when the state is unable to meet its

burden. *Perry* at ¶ 15.

{¶ 24} "We have recognized that when a defendant is represented by counsel and tried by an impartial fact-finder, there is a strong presumption that all errors—constitutional and nonconstitutional—are subject to harmless-error review." *Jones* at ¶ 19. Nonetheless, the United States Supreme Court and this court have held that certain errors cannot be deemed harmless. *E.g.*, *Weaver v. Massachusetts*, ___ U.S. ___, ___ 137 S.Ct. 1899, 1907-1908, 198 L.Ed.2d 420 (2017); *Perry* at ¶ 17.

{¶ 25} Structural errors are "constitutional defects that ' "defy analysis by 'harmless error' standards" because they "affect[] the framework within which the trial proceeds, rather than simply [being] an error in the trial process itself." ' " (Brackets added in *Fisher*) *Perry* at ¶ 17, quoting *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, quoting *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). "Despite its name, the term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.' " *Weaver* at ___, 137 S.Ct. at 1910, quoting *Chapman,* at 24.

{¶ 26} Structural error has been recognized only in limited circumstances involving fundamental constitutional rights, including the denial of counsel to an indigent defendant, the denial of counsel of choice, the denial of self-representation at trial, the denial of a public trial, and the failure to instruct the jury that the accused's guilt must be proved beyond a reasonable doubt. *Id.* at ___, 137 S.Ct. at 1908; *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013).

### *Judicial Questioning of the Accused*

{¶ 27} In questioning witnesses and commenting on the evidence, a judge may create "a risk of the appearance of bias." *State v. Cepec*, 149 Ohio St.3d 438,

2016-Ohio-8076, 75 N.E.3d 1185, ¶ 81.  We have therefore admonished judges that " ' [i]n a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.' "  *Id.* at ¶ 72, quoting *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), paragraph three of the syllabus.

**{¶ 28}** West, however, failed to object to any of the trial judge's comments or questions in this case.  Therefore, our review is for plain error only, as assertions of structural error do not preclude an appellate court from applying the plain-error standard when the accused has failed to object.  *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 24; *Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 23; *Johnson v. United States*, 520 U.S. 461, 465-466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

**{¶ 29}** Even assuming that the judge plainly erred in participating in West's cross-examination, West must still demonstrate a reasonable probability that the judge's error prejudiced him and that reversal is necessary to correct a manifest miscarriage of justice.  *See Rogers*,  at ¶ 22.

**{¶ 30}** West has not established a reasonable probability that the judge's actions affected the outcome of the trial.  The evidence of guilt was overwhelming. The store's security cameras captured West having an altercation with Akers, being held back by other customers, and pushing through them to follow Akers outside. After being punched, West admitted being mad and participating in the fight.  When Akers and Reese retreated to the Charger, West pursued them.  Although he claimed that Banks had a firearm, the security-camera footage shows no indication of it, and rather than seeking cover, D punched Banks before West and his group started walking away.  Though in no apparent danger, West obtained a handgun from D, emptied the clip in Akers's direction from at least a car-length away, and then drove away as police arrived.  He then lied to the police about the shooting and failed to

assert self-defense as he gave his statement. This evidence contradicts West's claim that he acted in self-defense.

{¶ 31} The jury was able to gauge the credibility of West's testimony and compare his version of events with the security-camera footage documenting the shooting. The jury was also instructed to disregard any inference it might draw from the judge's questioning and tone, and it is presumed that a jury follows the trial court's instructions, *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). A review of the record demonstrates that no reasonable factfinder could have examined the evidence and determined that West's assertion of self-defense was credible. Therefore, there is no reasonable probability that any comment or question by the judge affected the outcome of this case.

{¶ 32} Both dissenting opinions recognize that plain-error review applies when a defendant has failed to object to an alleged structural error in the trial court. Nonetheless, they would reject the traditional outcome-determinative test of evaluating prejudice under the plain-error rule and hold that an appearance of judicial bias automatically affects a defendant's substantial rights.

{¶ 33} But their approach is inconsistent with that of the federal courts, which rely on the outcome-determinative standard in reviewing unpreserved claims of judicial bias. Indeed, when such an error has occurred, courts applying plain-error review consider the likelihood that the outcome of the proceedings would have been different but for the judge's actions in questioning witnesses. *See, e.g.*, *United States v. Barnhart*, 599 F.3d 737, 745-747 (7th Cir.2010) (holding that although the judge's questioning witnesses constituted error, that error did not affect the defendant's substantial rights, because he failed to show that "but for the judge's improper questioning, he probably would not have been convicted"); *United States v. Rivera-Rodríguez*, 761 F.3d 105, 123 (1st Cir.2014) (concluding that the case against the defendant was not strong and thus "[w]ithout [the judge's] improper interventions, there is a reasonable probability that [the defendant] would

not have been convicted").

{¶ 34} The United States Supreme Court has also employed an outcome-determinative analysis when reviewing alleged structural defects for plain error. In *Johnson*, the court considered the effect of a trial-court error in failing to submit an element of the crime to the jury. 520 U.S. at 467, 117 S.Ct. 1544, 137 L.Ed.2d 718. The court concluded that even assuming that the error was structural, reversal was unwarranted because the evidence supporting the omitted element was "overwhelming." *Id*. at 469-470; *see also United States v. Cotton*, 535 U.S. 625, 632-633, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (indictment's failure to allege a fact that increased the statutory maximum sentence was not plain error, because the evidence was overwhelming and essentially uncontroverted).

{¶ 35} Were this court to hold that reversal is warranted any time a structural error has occurred, there would be no practical difference between reviewing the error under the harmless-error and plain-error standards of review. As the *Johnson* court explained, "the seriousness of the error claimed does not remove consideration of it from the ambit of the Federal Rules of Criminal Procedure." *Id*. at 466. We likewise decline to elevate any class of errors beyond the application of our plain-error rule. And while we recognize that there may be situations in which a structural error so affects the fairness of a judicial proceeding that reversal is warranted despite the failure to preserve the error, this is not such a case. Because of the overwhelming evidence of West's guilt, he is unable to show any reasonable probability that the outcome of his trial would have been otherwise. He therefore failed to establish the prejudice prong of the plain-error rule.

## Conclusion

{¶ 36} Because West failed to object to the trial judge's questioning him during his cross-examination, he bears the burden to establish a reasonable probability that but for the judge's actions, he would not have been found guilty of the charged offenses. Given the overwhelming evidence of his guilt, this is a

showing that West cannot make.

{¶ 37} We are convinced from the record that any error did not affect the outcome of West's trial. We therefore affirm the judgment of the Tenth District Court of Appeals.

Judgment affirmed.

FISCHER and DEWINE, JJ., concur.

O'CONNOR, C.J., concurs in judgment only.

DONNELLY, J., dissents, with an opinion.

BRUNNER, J., dissents, with an opinion joined by STEWART, J.

_____

**DONNELLY, J., dissenting.**

{¶ 38} The issue in this case is whether the trial judge exhibited bias in favor of appellee, the state of Ohio, and against appellant, James R. West Jr., through his comments and questions during the jury trial. Like the judge in the Tenth District Court of Appeals who dissented in part below, I believe the record here substantiates West's claim of judicial bias that, when coupled with other collateral harm that I will discuss later, constitutes "structural error" that irreparably compromised the fundamental fairness of the trial-court proceedings. I therefore believe we should recognize plain error here in order to correct a constitutionally flawed trial process.

{¶ 39} The lead opinion, on the other hand, stating that it will "not retreat" from requiring that all forfeited errors, including structural errors, be subject to plain-error analysis under Crim.R. 52(B), finds no plain error here. Lead opinion, ¶ 2. It does so without actually addressing whether there was an error that was plain and without ever saying whether the trial judge's behavior was structural error. Instead, it simply concludes that West failed to show that the outcome of his trial would have been different.

{¶ 40} Contrary to the conclusion in the lead opinion, however, I believe that there is a reasonable probability that West was prejudiced by the trial judge's conduct. I would, accordingly, reverse West's conviction and grant him a new trial. Because the majority instead upholds West's conviction, I respectfully dissent.

{¶ 41} There is no dispute that West did not object to the trial judge's repeated questioning of witnesses and interruptions. I readily agree with the lead opinion that West's assertion of structural error does not exempt the trial judge's actions from being subject to the plain-error analysis applicable to any unpreserved issue. *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 23 (unpreserved claim of structural error remains subject to Crim.R. 52(B)).[1] But the lead opinion does not fully apply that analysis to the facts of this case.

{¶ 42} Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To qualify for plain-error relief, the defendant must establish that (1) an error (i.e., a deviation from a legal rule) occurred, (2) the error was plain (i.e., obvious), and (3) the error affected the defendant's substantial rights. *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 36; *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, 89 N.E.3d 554, ¶ 64; *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Even then, an appellate court is not required to correct a plain error. *See State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 23. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest

---

1. The lead opinion's reliance on *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, is misplaced because that case involved only plain error, not structural error.

miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.[2]

{¶ 43} In this case, the lead opinion does not address the first or second plain-error prongs—whether an error occurred and whether it was plain—but instead proceeds directly to address the third prong of the analysis—whether the error affected West's substantial rights. Believing that the issue here cannot properly be resolved without the context of full plain-error analysis, I hereafter apply that analysis to the specific facts of this case.

### Whether There Was Error

{¶ 44} Evid.R. 614(B) authorizes a trial court to interrogate witnesses "in an impartial manner." *See State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127. In *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 72-73, we restated the limits of judge questioning in a jury trial:

> "In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness." *State ex rel. Wise v. Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613 (1970), paragraph three of the syllabus.
>
> "[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 34. The term "biased" "implies a hostile feeling or spirit of ill will or undue friendship or *favoritism toward one of the litigants* or his attorney, with the formation of a fixed anticipatory judgment on the part of

---

2. Federal courts apply the same plain-error analysis under Fed.R.Crim.P. 52(b) and will grant relief only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See, e.g.*, *United States v. Marcus*, 560 U.S. 258, 262, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010).

the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph four of the syllabus.

(Brackets sic and emphasis added.)

{¶ 45} To determine whether the trial judge's questioning of witnesses was conducted in an impartial manner requires consideration of the trial record as a whole. *See United States v. Saenz*, 134 F.3d 697, 702 (5th Cir.1998); *United States v. Tilghman*, 134 F.3d 414, 417 (D.C.Cir.1997). " 'To rise to the level of constitutional error, the * * * judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor.' " *Saenz* at 702, quoting *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir.1994).

{¶ 46} In the case before us, the trial transcript exposes an escalating lack of impartiality by the trial judge as shown by repeated instances of gratuitous judicial intervention that bolstered the state's case while undermining West's case.

{¶ 47} For example, when Patrick Akers testified on direct examination that he did not see who picked up the two guns that fell to the ground in the parking lot but that he did see West hand a gun to one of his confederates, the trial judge interjected:

> THE COURT: So you're saying you saw the defendant with two guns, hand one to somebody, and did he still have a gun?
> THE WITNESS: That's correct.

16

{¶ 48} After the prosecutor asked Akers to identify the person who had started shooting in the parking lot and Akers named West as the shooter, the trial judge could not resist interjecting to ask for an in-court identification:

>THE COURT: The defendant over there that you've identified?
>
>THE WITNESS: That's correct.

{¶ 49} When the prosecutor questioned Akers about security-camera video of the parking lot that was being played for the jury, the trial judge twice interjected to have Akers identify West in the video.

{¶ 50} After the trial court denied West's Crim.R. 29 motion for acquittal at the close of the state's case, West's counsel asked for an Evid.R. 104 hearing to address West's desire to testify on his own behalf against the advice of counsel. West stated that he wanted to fire his lawyer, but the trial court told West that he could not fire his lawyer that close to the end of the trial. After the court confirmed West's desire to testify on his own behalf, West took the witness stand.

{¶ 51} Describing the in-store confrontation between himself and Akers, West testified that he had taunted Akers by pulling out a wad of money and saying, "Look, you'll never get this much money," to which Akers replied, "N* * **, I'm gonna take that s* * * from you." As West testified about the events inside the store that were captured on security-camera video, the trial judge interjected:

>THE COURT: So you're claiming that [Akers] said he would rob you?
>
>THE DEFENDANT: Yeah. His actual words was, "I'm gonna take that s* * *," is what he said to me. And then we go to the part where we're going outside the door.

**{¶ 52}** When West testified moments later that he saw Akers going to his car after he had said that he would rob West, the trial judge again interjected:

> THE COURT: He didn't say he was going to rob you. You thought that's what he was implying by saying the "N" word, and "I'm going to take your money."
>
> THE DEFENDANT: He said, "I'm gonna take that s* * *." I told him he would never get that kind of money that I had on me at the time.* * *

This confrontational exchange before the jury makes clear that it was the *trial judge* who interpreted Akers's statement as an indication that Akers was going to rob West, yet the trial judge attacked West's credibility because Akers did not in fact use the word "rob." West's acquiescence to the trial judge's characterization of Akers's statement does not change the fact that West never testified that Akers had used the word "rob."

**{¶ 53}** Still, during the course of West's direct examination while the security video played, the trial judge interjected:

> THE COURT: Is that you with the gun, shooting?
>
> THE DEFENDANT: That is me with the gun, shooting.
>
> THE COURT: You can explain in a moment.

Given the trial judge's repeated interruption of West's testimony, I discern no reason for denying West the opportunity to explain his conduct at that point in the trial.

**{¶ 54}** Before the prosecutor cross-examined West, the trial judge questioned whether West had seen one of Akers's confederates emerge from a car with a gun.

> THE COURT: Did you see a gun?  Did you see a gun?
>
> THE DEFENDANT: I saw a gun.
>
> THE COURT: But he went backwards behind the car?
>
> THE DEFENDANT: He came out with a gun behind the car, and that's when we immediately started backing up.
>
> THE COURT: Are you testifying that any shots were fired at you?
>
> THE DEFENDANT: I don't know.  I don't know. Everything was — I wasn't sure I seen — I don't know for sure that the other guy dropped his gun.

**{¶ 55}** When West's counsel concluded her direct examination of West, the trial judge gave West an open forum to add anything else to his testimony.

**{¶ 56}** At the outset of his cross-examination of West, the prosecutor was quick to seize upon and indeed align himself with the trial judge's confrontation with West about whether Akers had said he was going to "rob" West:

> Q. [Prosecutor]: As the Judge correctly pointed out, he didn't say he was going to rob you?
>
> A. [West]: In slang terms in the neighborhood, "N* * **, I'm gonna take that s* * *," what else could he mean?

**{¶ 57}** West acknowledged during cross-examination that he could have gone about his business while Akers went about his own business, but the trial judge

summarily precluded West from testifying about why he did not do that with a curt, "They've heard you explain why."

{¶ 58} Then, as the prosecutor signaled that he was wrapping up his cross-examination, the trial judge prompted an entirely new line of questioning that was of apparent interest to him—and, by implication, of interest to the jury:

> THE COURT: Did [West] make a statement to a police officer?
> MR. PIERSON [Prosecutor]: He did.
> THE COURT: All right.  Let's move on.

And it is here that the trial judge's overt bias and lack of impartiality finally poisoned the proceedings beyond any point of salvage.

{¶ 59} Earlier in the trial, Detective Randy VanVorhis with the Columbus Police Department testified that West had given a statement to the police in which he had denied having a gun, shooting a gun, or knowing who was shooting a gun on the night in question.  When the prosecutor questioned West about his statement to the police during the extended cross-examination, the prosecutor asked: "And, of course, you told them you had a gun and were shooting because these guys brought a gun into the situation?"  Before West could even begin to respond, the trial judge again interjected:

> THE COURT: You lied to the police, didn't you?
> THE DEFENDANT: Because I wanted to give myself a fighting chance at court.
> Q: That's what you're doing here, lying to the Court to give yourself a fighting chance here?

20

A: No, I just knew if I pled guilty that day, there would be no way for me to come all the way to this point.

**{¶ 60}** The trial judge's officious interjection here did not serve just to tell West that he had lied. It communicated an unmistakable and more troubling message from judge to jury: this defendant lies.

**{¶ 61}** The trial judge then rebuked West for his apparent misapprehension that a statement to the police would be tantamount to a plea to a criminal charge:

THE COURT: It wasn't a question of pleading. You waived your right, and you made a statement to the police. You didn't tell them it was self-defense at that time. It's just that simple, right?

THE DEFENDANT: Yes, sir.

When the prosecutor concluded his cross-examination of West and West's counsel indicated that there would be no redirect examination, the trial judge again gave West an open forum to add anything else to his testimony that would not be repetitive of his prior testimony. As West began to testify with no questions before him, his counsel objected. Mindful of the preexisting tension between West and his counsel, the trial judge proclaimed in front of the jury: "I want to give him a chance to say everything, but your lawyer thinks you should stop." While ostensibly addressed to West, this gratuitous comment sent a disturbing message to the jury: West's own lawyer does not want you to hear what he may say.

**{¶ 62}** West's case fundamentally turned on the credibility of the witnesses. The jury had to decide whether to believe that West had acted in self-defense. When the credibility of witness testimony is at issue in a jury trial, it is most imperative that the trial judge exhibit steadfast impartiality in his trial conduct so as not to influence the jury in its credibility determinations by betraying his belief

as to the defendant's guilt or innocence. *See Chand*, 21 Ohio St.2d 113, 256 N.E.2d 613, paragraph three of the syllabus.

{¶ 63} For example, in *United States v. Victoria*, 837 F.2d 50 (2d Cir.1988), the defendants were convicted on federal charges of conspiracy to manufacture, distribute, and possess with intent to distribute cocaine. They claimed to have been unaware that boxes they had delivered to an apartment contained materials used in a cocaine-manufacturing operation. The trial judge repeatedly interrupted the defendants' direct examinations with questions that "revealed interrogation in the nature of cross-examination challenging the credibility of the witnesses." *Id*. at 54. Reversing the defendants' convictions based on judicial misconduct, the Second Circuit Court of Appeals explained:

Clearly implied in the questions is the Court's skepticism regarding the appellants' claim that they lacked any knowledge of the cocaine manufacturing operation. Even before the prosecutor's cross-examination of [one appellant], the trial judge intervened with questions he later said were designed to test the credibility of the witness.

* * * There can be no doubt that the Court's interruption * * * did not have as its purpose the clarification of ambiguities, the correction of misstatements or the development of information used to make rulings. The sole purpose of the interrogation, as conceded by the trial court, was to challenge the credibility of the witness. Unfortunately, it also served to convey to the jury here the judge's opinion that the witness was not worthy of belief. When such doubt is injected by the court in a case where credibility of a defendant-witness is a key issue, there has been a deprivation of a fair jury trial.

(Citations omitted.)  *Id*. at 54-55.

{¶ 64} The trial judge's interjections here were similarly intended to challenge West's credibility before he was ever subjected to cross-examination by the prosecutor.  Indeed, the trial judge did not mince words about what he really thought of West.  When sentencing West, the trial judge stated:

> THE COURT: And I think you lied on the stand.  I do, sir, I'm sorry.  I think you absolutely lied and changed your story.  I get it, nobody wants to do 12 or 13 years.  People do lie when they're facing heavy time.  You're out there thugging.  Maybe you're not a thug.  I don't know.
> * * *
> * * * I think you were high that night.  That's what I think.  I think you were on something.

There was, of course, no evidence presented at trial to substantiate the trial judge's character assessments.

{¶ 65} I empathize with the frustration of trial judges who occasionally endure meandering witness examinations and who may be tempted to clarify testimony that may be unclear to jurors.  But in an adversarial system of justice with parties represented by counsel, it is those parties who are responsible for presenting their respective cases in the crucible of trial.  Judges must resist the urge to intervene so as not to compromise the fundamental integrity and fairness of the trial proceedings.

{¶ 66} On this record, however, I have no difficulty concluding that the trial judge did not conduct the trial proceedings with the steadfast impartiality demanded by Evid.R. 614(B).

**Whether The Error Was Plain**

{¶ 67} That the trial judge widely overstepped his bounds in his witness interrogations is plain and obvious. Indeed, the trial judge himself felt obliged to give a curative instruction *concerning his own trial conduct*, supplementing the final jury instructions with the following statements:

> The next part is important. Sometimes I ask questions. However, any question that I ask or any tone in my voice, because I can get aggravated, don't take that as any indication of how I think the case should come out.
>
> How I think the case should come out has no bearing on anything. Don't place any emphasis on any questions I asked, and don't put any emphasis on why I asked a question. It doesn't matter. What matters is your evaluation. If I did anything, disregard it.

{¶ 68} To be sure, a timely curative instruction may, in some circumstances, adequately address an isolated instance of bias. *See, e.g.*, *Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, at ¶ 76-77 (curative instruction sufficient to address arguably questionable tone of judge's isolated interjection). In this case, however, no curative instruction was given contemporaneously with any of the trial judge's numerous interjections during the course of the three-day trial in which jurors could see and hear the trial judge become increasingly aggravated with certain witnesses' testimony while being more solicitous of other witnesses' testimony. Instead, the curative instruction was given at the end of the trial court's instructions to the jury. Given the extent to which the trial judge's behavior may have influenced the jury's assessment of West's credibility throughout the course of this trial, a curative instruction given just minutes before the case was delivered to the jurors for their deliberations is simply too little and too late.

{¶ 69} Viewing the entire trial record in context, I have no difficulty concluding that the trial court's officious conduct was plain, obvious, and persistent.

**Whether the Defendant's Rights Were Substantially Affected**

{¶ 70} To qualify as plain error, the error must have affected the defendant's substantial rights by affecting the outcome of the trial. *See State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 52; *Barnes,* 94 Ohio St.3d at 27, 114 N.E.3d 1092 (error affects substantial rights if it affected the outcome of the trial). A defendant invoking plain error typically must demonstrate a reasonable probability that the error resulted in prejudice. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 22.

{¶ 71} It is unclear, however, whether all forfeited errors require a specific showing that the error in fact affected the defendant's substantial rights. In *United States v. Olano*, 507 U.S. 725, 735, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the United States Supreme Court observed that "[n]ormally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)," acknowledging that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome" and others "that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice."

{¶ 72} In this case, West maintains that it was "structural error" for him to stand trial before a judge who was not impartial. *See Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Structural errors fall within the " 'very limited class' " of fundamental constitutional errors that affect the adjudicatory framework within which a criminal trial proceeds, rather than being simply an error in the trial process itself. *United States v. Marcus,* 560 U.S. 258, 263, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010), quoting *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *see also Arizona v. Fulminante*, 499 U.S. 279,

310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). While the lead opinion sets forth several recognized structural errors, it conspicuously omits the specific structural error alleged in this case—a biased judicial officer. *See* lead opinion at ¶ 26.

{¶ 73} Because a structural error infects the entire trial process from beginning to end, it defies analysis by harmless-error standards, *see Fulminante* at 309-310, and renders the criminal trial an unreliable vehicle to determine guilt or innocence or to impose a fair criminal punishment, *see Rose v. Clark*, 478 U.S. 570, 577-578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Structural errors "are so intrinsically harmful as to require automatic reversal (*i.e.,* 'affect substantial rights') without regard to their effect on the outcome." *Neder v. United States*, 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Consistent with the foregoing, our decisions have likewise recognized that the presence of a biased judge on the bench constitutes a structural error warranting reversal. In *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001), we stated: "The presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis." More recently in *Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, at ¶ 73, we reiterated that "[t]he presence of a biased judge is structural error, which, if demonstrated, requires reversal."

{¶ 74} In this case, however, the lead opinion does not definitively say whether or not the trial judge's conduct here qualified as structural error. The lead opinion similarly does not directly say whether a biased judicial officer is grounds for automatic reversal under plain-error analysis or instead requires an affirmative showing that the judge's bias actually affected the outcome of the trial. The lead opinion does not cite any case in support to suggest that the structural error of a biased judicial officer requires proof that the bias actually affected the defendant's

substantial rights.[3] The lead opinion nevertheless says that assuming that the judge plainly erred in participating in West's cross-examination, West has not established a reasonable probability that the judge's actions affected the outcome of the trial. I respectfully disagree.

{¶ 75} Putting aside for the moment whether the trial judge's conduct here represented a structural error, the fact that the trial judge felt impelled to provide a curative instruction just prior to the commencement of the jury's deliberations was a tacit acknowledgement by the judge of a reasonable probability that his trial behavior may have affected the jury's consideration of the evidence. And that, by implication, could affect the defendant's substantial rights. So regardless of whether the judge's actions in this case rose to the level of structural error, the cumulative effect of the trial judge's interjections that necessitated his belated curative instruction itself establishes a reasonable probability that the error was prejudicial.

{¶ 76} While bias may be apparent at the inception of a case, it may also emerge at any point during the course of a case or proceeding—and perhaps at no worse time than when the case is being tried to a jury. And in this case, the trial judge's intrusive interjections permeated the trial proceedings in exponential fashion, bolstering the state's case while casting doubt on West's credibility and thus on his case. I disagree with the lead opinion's attempt to minimize the impact of the trial judge's persistent interruptions. Regardless of the strength of the state's case, the trial judge needlessly stepped in to assist the state's presentation to the point of telling the jury that West's testimony was not worthy of belief.

---

3. The lead opinion cites *United States v. Barnhart*, 599 F.3d 737, 745-747 (7th Cir.2010), but that case involved improper questioning by the judge, not the structural error of a biased judicial officer. And although the improper judicial intervention in *United States v. Rivera-Rodríguez*, 761 F.3d 105, 123-124 (1st Cir.2014), was not addressed as structural error, its cumulative effect was nevertheless deemed to be so prejudicial as to result in the court's vacating the defendant's conviction.

**{¶ 77}** The lead opinion insists that "[t]he evidence of guilt was overwhelming." Lead opinion at ¶ 30. But that is immaterial if West had to stand trial before a biased judicial officer. In *Tumey*, 273 U.S. at 535, 47 S.Ct. 437, 71 L.Ed. 749, the United States Supreme Court flatly stated: "No matter what the evidence was against him, [Tumey] had the right to have an impartial judge." Indeed, if the trial court had deprived West of the right to have appointed counsel represent him at trial, would today's lead opinion dismiss a claim of error because the evidence of guilt was overwhelming?

**{¶ 78}** Whether every structural error is necessarily grounds for automatic reversal under plain-error analysis without an affirmative showing that the defendant's substantial rights were actually affected remains an open question. The United States Supreme Court has, on several occasions, declined to resolve whether structural errors "automatically satisfy the third prong of the plain-error test" because it was unnecessary to do so. *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 140-141, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (breach of plea deal was not structural error); *United States v. Cotton*, 535 U.S. 625, 632-633, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2000) (indictment's failure to allege drug quantity did not seriously affect the fairness, integrity, or public reputation of judicial proceedings); *Johnson*, 520 U.S. at 469-470, 117 S.Ct. 1544, 137 L.Ed.2d 718 (failure to submit issue of materiality to jury did not seriously affect the fairness, integrity, or public reputation of judicial proceedings); *Olano*, 507 U.S. at 737-741, 113 S.Ct.1770, 123 L.Ed.2d 508 (presence of alternate jurors during jury deliberations did not seriously affect the fairness, integrity, or public reputation of judicial proceedings).

**{¶ 79}** I agree that we should exercise restraint before pronouncing categorically that a particular unpreserved structural error necessarily affected the defendant's substantial rights prejudicially. Contrary to what the lead opinion says, I do not mean to suggest that the mere "appearance of judicial bias automatically affects a defendant's substantial rights," lead opinion at ¶ 32. In my view, there is

a qualitative distinction between an appearance of judicial bias (a trial error) and a biased judicial officer (a structural error).

{¶ 80} And I cannot imagine a more fundamental breakdown of the criminal-trial framework than to have the presiding judge overtly communicate to the jury his disbelief of the defendant's case. Had West objected to this structural error in this case, there could be little doubt that automatic reversal would be warranted without West's having to show that but for the error, the outcome of the trial would have been different. I do not understand how West's failure to object to a broken trial process can validate that broken process. The lead opinion provides no legal justification for requiring proof that the defendant's substantial rights were actually affected by an error that intrinsically affected the defendant's substantial rights.

### Manifest Miscarriage of Justice

{¶ 81} Establishing plain error does not necessarily warrant granting relief for plain error. As indicated previously, our precedent establishes that notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 82} In my view, this case qualifies for recognition of plain error for two reasons. First, and most obviously, the nature of the error here is so fundamental to the integrity of criminal-trial proceedings that to ignore it would be a manifest miscarriage of justice.

{¶ 83} Second, the trial judge was already aware of tension between West and his counsel. The court was aware that West wanted to testify on his own behalf contrary to the advice of his counsel. The court was further aware that West wanted to fire his counsel at the conclusion of the state's case.

{¶ 84} Mindful of an already strained attorney-client relationship, the trial judge invited West to testify about anything he wanted to add to his testimony.

When West's counsel objected, the trial judge said, "I want to give him a chance to say everything, but your lawyer thinks you should stop." Aside from fueling the hostility and distrust between attorney and client, the trial judge's comment in front of the jury suggested that West's attorney must have had something to hide because she did not want him to testify further.

{¶ 85} These trial proceedings show not only a fundamental breakdown of the criminal-trial process but also an attempt to undermine the attorney-client relationship. I do not see how these critical errors can simply be swept under the "harmless error" rug. They represent fundamental violations of any fair-criminal-trial process. Because the lead opinion declines to recognize these errors for what they are, I respectfully dissent.

_____

**BRUNNER, J., dissenting.**

{¶ 86} I generally concur in Justice Donnelly's dissent, but I wish to clarify that plain-error analysis of whether the error affected the trial's outcome is unnecessary when a structural error is recognized.

{¶ 87} I agree with Justice Donnelly that the United States Supreme Court has not settled whether a party arguing error to be both plain and structural must demonstrate prejudice to substantial rights.[4] However, for crimes adjudicated in Ohio courts, the plain language of Crim.R. 52 controls.

---

4. The United States Supreme Court has observed that it "has several times declined to resolve whether 'structural' errors—those that affect 'the framework within which the trial proceeds,' *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)—automatically satisfy the third prong of the plain-error test [that is, that the error affected substantial rights, which in the ordinary case means that it affected the outcome of the proceedings]." *Puckett v. United States*, 556 U.S. 129, 140, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009), citing *United States v. Olano*, 507 U.S. 725, 735, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), *Johnson v. United States*, 520 U.S. 461, 469, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997), and *United States v. Cotton*, 535 U.S. 625, 632, 122 S.Ct. 1781, 152 L.Ed.2d 86 (2002). In other words, when the United States Supreme Court has been asked to apply plain-error review to a structural error, it seems to have avoided the question, instead holding the error not to be structural. *See, e.g.*, *Johnson* at 468-470.

**{¶ 88}** In Ohio, harmless errors are errors that do not affect substantial rights. Crim.R. 52(A). Yet structural errors can never be harmless. *State v. Sanders*, 92 Ohio St.3d 245, 278, 750 N.E.2d 90 (2001) ("The presence of a biased judge on the bench is, of course, a paradigmatic example of structural constitutional error, which if shown requires reversal without resort to harmless-error analysis"), citing *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.302 (1991). Moreover, while some structural errors (such as denial of the right to a public trial or to select defense counsel) may not, in the end, affect a trial's outcome, it would be hard to argue that any structural error does not "affect substantial rights." *See, e.g.*, *Weaver v. Massachusetts*, ___ U.S. ___, ___, 137 S.Ct. 1899, 1907-1908, 198 L.Ed.2d 420 (2017) (noting that structural error has been recognized in cases when the defendant was denied the right to conduct his own defense, the right to select his own attorney, the right to a reasonable-doubt instruction, or the right to an attorney); *Fulminante* at 309-310 (noting other previously found structural errors, including judicial bias, racially exclusive grand-jury proceedings, and the deprivation of a public trial). Structural error by its nature affects substantial rights. *Weaver* at ___, 137 S.Ct. at 1907-1908. And Crim.R. 52(B) requires that "plain error" be an "error[] or defect[] affecting substantial rights." Therefore, a "structural error" may also be a "plain error," according to Crim.R. 52(B).

**{¶ 89}** The failure to object to an alleged error at trial generally triggers plain-error analysis, even when the alleged error could be a potential structural error. *See, e.g.*, *Johnson v. United States*, 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). *But see State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 35 ("However, in *State v. Colon*, 119 Ohio St.3d 204, 2008-Ohio-3749, 893 N.E.2d 169 * * *, this court clarified that when a defendant fails to preserve objections to a defective indictment during the course of a trial, the issues are generally forfeited and must be reviewed under a plain-error analysis except in

rare cases of structural error. *Id.* at ¶ 7"); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 39 (using identical language).

**{¶ 90}** A court may choose to disregard plain error. Thus, plain-error analysis is permissive: "Plain errors or defects affecting substantial rights *may be noticed* although they were not brought to the attention of the court." (Emphasis added.) Crim.R. 52(B). We have previously recognized that courts should use restraint when recognizing plain errors, even when such errors might otherwise have been deemed structural.

> [B]oth this court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. *See* [*State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001)]; *Johnson*, 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed. 2d 718. This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to *encourage* defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed. We believe that our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court— where, in many cases, such errors can be easily corrected.

(Emphasis sic.) *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 23. But regardless of whether raised as or considered plain error, when the error is structural, no amount of analysis of whether the error affected the trial's outcome will diminish the fact that substantial rights were affected. *See Weaver* at

___, 137 S.Ct. at 1907-1908; *Fulminante* at 309-310; *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9.

{¶ 91} Consequently, if a reviewing court concludes that an unobjected-to plain error (e.g., when a court deprives the defendant of the right to a public trial and the defendant fails to object to the courtroom's closure) did not affect the outcome of the trial, the language of Crim.R. 52(B) permits the reviewing court to exercise restraint and choose to disregard it. But if a reviewing court conducting plain-error analysis concludes that a structural error occurred, no amount of analysis of whether the structural error affected the trial's outcome would change the fact that one or more substantial rights were affected. Plain errors are defined by rule for their propensity to affect substantial rights. *See* Crim.R. 52(B). Structural errors come in several varieties, but all concern substantial or fundamental rights. *See, e.g.*, *Weaver*, ___ U.S. at ___, 137 S.Ct. at 1907-1908, 198 L.Ed.2d 420; *Fulminante*, 499 U.S. at 309-310, 111 S.Ct. 1246, 113 L.Ed.302 (listing previously recognized structural errors, and, in addition, denial of the right to a public trial, judicial bias, and racially exclusive jury selection). Thus, if a plain error is determined to be structural, the analysis ends without the need to separately consider whether the error's effect on the defendant's substantial rights affected the outcome of the trial. *See, e.g.*, *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, ¶ 32-33.

{¶ 92} The lead opinion posits that under the dissenting justices' view, if "reversal is warranted any time a structural error has occurred, there would be no practical difference between reviewing the error under the harmless-error and plain-error standards of review." Lead opinion, ¶ 35. This is not true. Differences exist between plain-error review and harmless-error review, even in the context of structural error. First, plain error, unlike harmless error, requires a showing that the error was an obvious defect, and the burden is on the accused to show that an alleged error is plain. *Thomas* at ¶ 32-33. Second, the burden is on the state to

show, beyond a reasonable doubt, that an alleged error is harmless. *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23. Third, whether to notice plain error is discretionary—meaning, a court may choose to disregard an error that otherwise satisfies the plain-error standard, as a matter of discretion. Crim. R. 52(B). No similar discretionary latitude is accorded in the case of harmless error—when an error is shown to be harmless it "*shall be* disregarded." (Emphasis added.) Crim. R. 52(A). None of this analysis affects the fact that structural errors are in their own classification because, by their nature, they affect substantial rights. No separate determination follows, because the error is endemic to the process. A structural error may be an obvious defect in the trial proceedings, or not. It may be proven, or not. It may be noticed, or not. Because structural errors always affect substantial rights by their nature, they are never harmless.

**{¶ 93}** Further, plain-error review that applies an "outcome determinative standard," lead opinion at ¶ 32, is outdated. Using clear- or absolute-outcome determination first arose in Ohio in 1978 in a case in which this court held that "[a] jury instruction violative of R.C. 2901.05(A) does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Thirty-seven years later, in 2015, this court modified a clear-outcome-determination standard in favor of demonstrating a "reasonable probability" that the error resulted in prejudice:

> [E]ven if the error is obvious, it must have affected substantial rights, and "[w]e have interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial." [*State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).] The accused is therefore required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential

> standard for reviewing ineffective assistance of counsel claims. *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (construing Fed.R.Crim.P. 52(b), the federal analog to Crim.R. 52(B), and also noting that the burden of proving entitlement to relief for plain error "should not be too easy").

(Second set of brackets and emphasis added in *Rogers*.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. We confirmed the deliberate nature of this shift when, two years later, we stated:

> We recently clarified in *State v. Rogers* * * * that the accused is "required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *Id.* at ¶ 22, citing [*Dominguez Benitez* at 81-83.]

*Thomas* at ¶ 33.

{¶ 94} While the language of clear-outcome determination has continued to be repeated, even post-*Rogers*, it is more likely to be found in lengthy death-penalty opinions citing cases that predate *Rogers* and *Thomas*. *See, e.g.*, *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 31, 93; *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 135; *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 124; *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 39; *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 67. Recent cases that avoid using the old boilerplate language have instead used the language from *Rogers*. *See, e.g.*, *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 218; *State v.*

*Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 130; *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 72.

{¶ 95} Accordingly, when considering plain errors, I would use the legal standard enunciated in *Rogers* and reiterated in *Thomas*: an accused seeking to show that an obvious error affected his or her substantial rights (and thereby the outcome of the accused's trial) must demonstrate a reasonable probability that the error resulted in prejudice—that is, the accused must show that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding. *See Myers* at ¶ 130; *Dominguez Benitez* at 81-83; *Tench* at ¶ 218; *Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, 92 N.E.3d 821, at ¶ 33; *Rogers* at ¶ 22. This common-sense approach avoids such phrasings as "clear outcome determination," which refers to a concept that is generally impossible to prove when the accused has been tried to a jury. Because jury deliberations are held in secret, it is particularly difficult to discern whether a particular error clearly affected the outcome of a trial. *See* Evid.R. 606(B) ("a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror").

{¶ 96} I agree with Justice Donnelly that there was structural error in this case, which, by definition, affected West's substantial rights and therefore may also be noticed as plain error. While we could decline to notice the error (because plain-error analysis is permissive), I would notice both the plain and structural errors based on Justice Donnelly's description of the facts in this case. Accordingly, I would reverse the court of appeals' judgment and remand the cause for a new trial.

{¶ 97} With these points offered as a corollary to Justice Donnelly's dissenting opinion, I also respectfully dissent from the lead opinion in this case.

STEWART, J., concurs in the foregoing opinion.

_____

G. Gary Tyack, Franklin County Prosecuting Attorney, and Michael P.

Walton, Assistant Prosecuting Attorney, for appellee.

Joseph R. Landusky II, for appellant.

Russell S. Bensing, urging reversal on behalf of amicus curiae, Ohio Association of Criminal Defense Lawyers.

_____