[Cite as *State v. Sipos*, 2026-Ohio-2190.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                    :

    Plaintiff-Appellant,                 :

                                        No. 115935

    v.                                          :

SCOTT SIPOS,                                      :

    Defendant-Appellee.                  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 11, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696346-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Tasha L. Forchione, Assistant Prosecuting Attorney, *for appellant*.

Flowers & Grube and Louis E. Grube, *for appellee*.

EMANUELLA D. GROVES, J.:

{¶ 1} Plaintiff-appellant the State of Ohio ("State") appeals the granting of defendant-appellee Scott Sipos's ("Sipos") motion for mistrial and dismissal of the case with prejudice. We affirm the trial court's decision since the State failed to

(1) object and raise the challenges it asserts on appeal before the trial court, and (2) assert plain error on appeal.

## I.    Facts and Procedural History

{¶ 2} In October 2024, Sipos, Mayfield Village's former service director, was indicted in a five-count indictment: for offenses that allegedly occurred between April and May 2024. Counts 1 and 2 charged Sipos with theft in office, fourth-degree felonies. Count 3 charged him with identity fraud, also a fourth-degree felony. Count 4 charged Sipos with misuse of credit cards, and Count 5 charged him with representation by public official or employee, both first-degree misdemeanors.[1] Sipos filed a motion for a bill of particulars, demanded discovery, and pleaded not guilty. After several continuances were granted for various reasons — including ongoing discovery — the matter proceeded to a jury trial in November 2025.

{¶ 3} After the jury was impaneled and the parties made their opening statements, the State called its first witness, Lawrence Tierney ("Tierney"), who retired from Mayfield Village's service department. Tierney offered testimony regarding his role in the department, the process for purchasing materials for Mayfield Village's projects using "ongoing credit" or "Village credit card[s]" issued to service-department employees, and the procedure for submitting receipts for

---

[1] R.C. 102.03 prohibits certain representations made by present or former public officials or employees. Sipos was charged with violating R.C. 102.03(D), which provides: "No public official or employee shall use or authorize the use of the authority or influence of office or employment to secure anything of value or the promise or offer of anything of value that is of such a character as to manifest a substantial and improper influence upon the public official or employee with respect to that person's duties."

those purchases. Tierney also offered testimony about one instance where Sipos told him to purchase supplies for a personal "project at home" using a credit card issued to Tierney and linked to Mayfield Village's account. Tierney testified that after this incident, Sipos continued to ask him for advice regarding his personal project and requested that additional materials be purchased for use in his home. Tierney "kept dodging," avoided making further purchases, and told the mayor's secretary, Mayfield Village's law director and police chief, and his attorney about his interactions with Sipos. Tierney also spoke with Mayfield Village Detective Kevin Miller ("Detective Miller") over the telephone and in person and provided him with a written statement.

{¶ 4} During cross-examination, Tierney's recounting of events was highly scrutinized and challenged. Tierney testified that he met with Detective Miller and believed his interview was recorded with "a recorder out that [he] could see." Defense counsel requested a sidebar, and an off-the-record discussion was held between the trial court and counsel. Cross-examination resumed, and Tierney testified: "I don't recall the recorder — I thought it was on the table, but I — what I can tell you, right, that what I recall is that I know that I filled out statements — a written statement." Tierney then testified that "[t]here's a possibility" that some information may not have been included in his written statement but may have been on the recording of his interview, if such a recording existed.

{¶ 5} The State requested a sidebar prior to redirect, and another off-the-record discussion was held between the trial court and counsel. Following this

sidebar, the trial court advised the jury that a brief recess was necessary to discuss some issues outside of its presence. The trial court then stated: "We're on the record. We are outside of the presence of the jury. Prior to commencing his redirect examination, [the prosecutor] requested the parties convene at sidebar, at which time he informed me that there is an issue. And at this time I'm going to allow him to place that issue the record." The prosecutor advised that while Detective Miller did not personally record Tierney's interview, "the room records [video]" and he "never asked about a room recording or [knew] that they had an interview room that was now recording things."

{¶ 6} The trial court then addressed defense counsel, and the following discussion was had:

> DEFENSE COUNSEL:  I had asked to approach the Court during my cross because I was concerned maybe I hadn't been given everything. And I was confident, knowing [the prosecutor] the way I know him, that he would give me what he had had.  All right? And he assured me at sidebar and assured the Court that there were no recordings in his possession that he knew of or ever existed, right?
>
> THE COURT: Correct.
>
> [DEFENSE COUNSEL]: Maybe I — it might be — my thought may be a stretch there, but that's how I took it from him.  And I appreciate the fact that he's now telling us that there's these recordings. . . . [I]t's not complicated police work to say, "I've made a recording" or "Our room records" or "I know there's a recording." . . . [F]or a decade we've wrestled over these things.  Clearly I should have these videos and audios before I start trial.
>
> THE COURT: Absolutely.  . . . I also want to state for the record that I've known [the prosecutor] for well over — God, well over a decade, probably close to 15 years, and I am — there's no doubt in my mind that when he stated at sidebar that he was not aware of any recordings prior

— at the prior sidebar that [defense counsel] was referring, I had no reason to doubt that either.

[DEFENSE COUNSEL:] No, Judge, and I appreciate that. And I mean that from my heart. I know this guy and I know he wouldn't do that. On the other hand, though, I have a client. He has a constitutional right for an effective counsel. He has a constitutional right to have his complete discovery. And right now, Judge, in my mind, frankly, I'm wrestling with do I make a motion for a mistrial and where does it put me. And, frankly, if I make a motion for a mistrial and this Court decides to grant it but doesn't find fault on the government, then I'm in a worse position than I am today because then all it gives them a chance to do is to reset.

THE COURT: Right.

[DEFENSE COUNSEL:] So at that risk, Your Honor, I'm going to ask the Court to grant a mistrial on this motion and to fault the government and release my client.

{¶ 7} The trial court turned its attention to Detective Miller, asking him several questions about his tenure at Mayfield Village Police Department, his awareness of interview recordings, and his procedure for pulling those recordings and providing them to the State. Detective Miller stated, "I save them on a hard drive. I assumed everyone knew they were available, but no one asked for them." The trial court asked why the recorded interviews were not turned over to the State with or as a part of case files, and Detective Miller replied, "It's just something that we have always done it that way."

{¶ 8} The trial court immediately granted the defense's motion for a mistrial, found that double jeopardy attached since the jury was sworn in, dismissed the case with prejudice, assessed costs to the State, released Sipos, and adjourned. The trial court then issued a journal entry stating: "[Sipos's] motion for mistrial with

prejudice is granted over State's objection. Case dismissed with prejudice. Costs assessed to the State of Ohio. Jury discharged. Case is dismissed with prejudice."[2]

{¶ 9} The State appeals, raising two assignments of error for this court's review.

**Assignment of Error No 1.**

The trial court abused its discretion by granting a mistrial as a discovery sanction without considering less severe remedies.

**Assignment of Error No. 2**

The trial court erred by imposing a double sanction, granting [Sipos's] request for a mistrial and then dismissing the case with prejudice, without any evidence or findings establishing a constitutional or statutory bar to reprosecution.

## II. Law and Analysis

{¶ 10} In its first assignment of error, the State argues that the trial court abused its discretion by imposing two drastic and extraordinary discovery sanctions — granting a mistrial and dismissing the indictment with prejudice — without considering whether less severe remedies would have been appropriate under the circumstances. In its second assignment of error, the State asserts that the trial court erred by dismissing the case with prejudice (1) without identifying a statutory basis or constitutional violation barring reprosecution, and (2) absent evidence of

---

[2] While the trial court's journal provides that Sipos's motion was granted over the State's objection, there is nothing in the transcript indicating that the State lodged an objection. Furthermore, in its reply brief, the State asserted that it was never given an opportunity to object.

intentional prosecutorial or judicial misconduct that could support a double-jeopardy bar to reprosecution after the defense requested a mistrial.

{¶ 11} Sipos counters, in relevant part, that the State forfeited the challenges raised in its assignments of error because it failed to object at the trial-court level. Sipos also asserts that the issues were waived before this court in the absence of any plain-error arguments. We agree with Sipos.

{¶ 12} Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under the plain-error standard, a party must show that "'but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice.'" *State v. West*, 2022-Ohio-1556, ¶ 22, quoting *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 13} Our review of the record reveals that, aside from its initial statement explaining the discovery issue, the State remained silent during on-the-record proceedings following off-the-record sidebars. The State did not oppose the defense's motion for a mistrial, raise any objections, propose alternative solutions or sanctions, or challenge the trial court's ruling. Contrary to the State's counterargument in its reply brief, the transcript makes clear that the trial court never "cut[] off the State's opportunity" to make its record; rather, the State never attempted to do so. Consequently, the State waived all but plain error under Crim.R. 52(B) and bears the burden of establishing that error on appeal. *State v. Bond*, 2022-Ohio-4150, ¶ 7 ("The main distinction between plain-error review,

which is the standard employed when a [party] failed to object at trial, and harmless-error review, which is employed when a [party] did object, is the party that bears the burden.").

{¶ 14} However, the State also fails to argue plain error on appeal. "Where a party fails to object to an error to the court below and then fails to make an argument that plain error occurred on an appeal, we will not consider the issue." *State v. Tate*, 2022-Ohio-4745, ¶ 20 (8th Dist.), citing *State v. Duncan*, 2022-Ohio-3665, ¶ 23 (8th Dist.); *State v. Speights*, 2021-Ohio-1194, ¶ 14 (8th Dist.) (citing relevant caselaw and emphasizing that an appellate court is not obligated to construct or develop unraised plain-error arguments). Indeed, this court must hold the State to the same standards it holds defendants. *State v. Gwynne*, 2019-Ohio-4761, ¶ 11 ("The appellate rule of forfeiture applies to any party claiming error, including the state."); *see, e.g., State v. Normile*, 2026-Ohio-1052 (8th Dist.) (declining to address a defendant's argument where no objection was raised at the trial-court level and plain error was not argued on appeal). Accordingly, we decline to address the State's challenges — all of which were brought for the first time on appeal and did not include plain-error analyses — and overrule its assignments of error.

{¶ 15} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, JUDGE

MICHELLE J. SHEEHAN, A.J., and
LISA B. FORBES, J., CONCUR